616 F.2d 976
 1980-1 Trade Cases 63,193
 CITY OF MISHAWAKA, INDIANA, City of Niles, Michigan, City of
Columbia City, Indiana, City of Bluffton, Indiana, City of
Garrett, Indiana, City of Gas City, Indiana, Town of
Frankton, Indiana, Town of Warren, Indiana, Town of New
Carlisle, Indiana, and Town of Avilla, Indiana, Municipal
Corporations, Plaintiff-Appellees and Cross-Appellants,
v.
AMERICAN ELECTRIC POWER COMPANY, INC., American Electric
Power Service Corporation, and Indiana and
Michigan Electric Company, Corporations,
Defendants-Appellants and
Cross-Appellees.
 Nos. 79-1190, 79-1237 and 79-1354.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 6, 1979.
Decided Feb. 21, 1980.
Rehearing and Rehearing En Banc Denied March 31, 1980.
 
 William J. Manning, New York City, for defendants-appellants and cross-appellees.
 Thomas R. Ewald, Washington, D. C., for plaintiffs-appellees and cross-appellants.
 Before SPRECHER and WOOD, Circuit Judges, and WILL, Senior District Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.[1]
 
 
 1
 Involved is the application of the Sherman Act[2] to a vertically integrated investor-owned electric utility, found by the trial court to be a monopoly. The utility's wholesale rates are subject to regulation by the Federal Energy Regulatory Commission[3] and its retail rates are subject to regulation either by the State Public Service Commission of Indiana in the instance of nine municipal plaintiffs or Michigan in the instance of one municipal plaintiff. The municipalities which own and operate local transmission systems for retail sale of electricity depend on defendants for their wholesale supply. Because the utility's wholesale rates charged the municipalities during the period 1976-1978 exceeded the retail rates charged to its own retail customers, the utility was found by the trial court to be guilty of a "price squeeze"[4] and of related exclusionary acts calculated to force the municipalities out of the retail electric business resulting in the conversion of municipal retail customers into retail customers of the utility. Triple damages were awarded based on rate overcharges and an injunction issued.[5] A cross appeal by the municipalities is also before us questioning the failure of the district court to award the municipalities their litigation expenses before the federal commission as an element of antitrust damages. Those commission proceedings involving these same parties considered related issues. This case in its preliminary stages was before us on interlocutory appeal.[6] In Mishawaka I, several issues were resolved. This court held that the utility was not immunized from Sherman Act attack and that the federal commission had neither exclusive nor primary jurisdiction over the utility faced with these antitrust charges. For the purposes of this case those issues are settled.
 
 
 2
 Although this case was well briefed and argued, it remains complex factually and legally.[7] Dual regulation, federal and state, of this electric utility, which is also subject to the Sherman Act, generates legal and practical problems in addition to electricity.[8] The necessary resolution by the courts of the involved complexities does not render a totally satisfying result. We shall first consider a capsule of the facts found by the district court, and then the various issues which arise.
 
 THE FINDINGS OF THE TRIAL JUDGE
 
 3
 The bench trial lasted three and one-half days supplemented by a lengthy stipulation of facts, numerous depositions and over a thousand exhibits. Following trial the judge filed a Memorandum Opinion, Judgment Order, and Findings of Facts and Conclusions of Law. Those documents, and the Findings of Facts in particular, are attacked by the utility as the work product of the municipal attorneys and not the trial judge. It is therefore argued that a broader scope of review is justified than the clearly erroneous standard ordinarily applied pursuant to Rule 52, Federal Rules of Civil Procedure. We bear that legitimate concern in mind as we consider this case, but after a review of the whole record including pretrial and post trial matters, we see no necessity in the circumstances of this case to abandon our usual standard of review. United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).
 
 
 4
 Further, the utility argues that this is a "paper case" largely founded on the stipulation and other documents in evidence. A broader review standard is therefore urged upon us. Yorke v. Thomas Iseri Produce Co., 418 F.2d 811, 814 (7th Cir. 1969). We more recently considered the prevailing rule in Flowers v. Crouch-Walker Corp., 552 F.2d 1277, 1284 (7th Cir. 1977). In applying a broader rule in that case we noted that the trial evidence consisted almost entirely of the testimony of a single witness whose credibility was not challenged. In the present case nine witnesses were heard including the managing officials of the utility during the times in question. The trial judge in his findings expressed "serious reservations" about the credibility of the utility officials. We cannot better judge the credibility of those witnesses unseen by us than the trial judge. Though the evidentiary documentation is voluminous, we see no need in these circumstances to use that as an excuse to go behind the findings of the trial judge. The testimony of the witnesses and the inferences to be drawn had an obvious impact on the judge's decision. After review of the case we do not have a "definite and firm conviction" that the trial judge made erroneous findings.
 
 
 5
 However, in reaching the conclusions we do about this case, we do not mean to imply that it results only from a strict application of the "clearly erroneous" standard. We would much prefer to be assured that what we review is the work product resulting from the judge's personal consideration and resolution of the evidence in the case and that it is not merely the disguised product of the successful advocate. We also realize, however, that as a practical matter in these times a busy trial judge may in some circumstances be properly assisted with some of the paper work resulting from his own determination of the issues. This appears to be such a case.
 
 FACTUAL BACKGROUND
 
 6
 The three related defendant companies will be considered as one for our purposes and referred to as the utility.[9] The utility generates, transmits and sells electricity at wholesale to the ten municipal plaintiffs, and also at retail to its own industrial, commercial and residential customers. The plaintiff municipalities may be considered for practical purposes as purchasing all of their wholesale electricity from the utility which in turn they individually distribute at retail to their own local customers through their electric distribution systems. The wholesale rates charged by the utility are subject to federal regulation.[10] The wholesale rates filed by the utility become effective, subject to refund, thirty days after filing or after a maximum five-month suspension ordered by the federal commission. However, the retail rates sought by the utility in both Indiana and Michigan under the respective statutes of those states do not go into effect automatically prior to approval, but must await an order of the particular state commission fixing the rates.
 
 
 7
 In 1968, the municipalities individually entered into new full-requirements contracts with the utility for wholesale electricity. The utility during the period 1968-1978 filed for seven retail rate increases in Indiana, four in Michigan, and three federal requests for wholesale increases. The first of the three federal requests resulted in a refund to the municipalities settled by the utility for $1,678,511 plus about $300,000 interest. The latter two requests remain unresolved. Some of the state retail filings resulted in a degree of increase in retail rates. At least one state filing is undetermined.
 
 
 8
 As explained by the utility, it anticipated a future energy shortage, and therefore advised the municipalities that full-municipal requirements contracts would not be renewed. The municipalities were further advised to seek alternative sources of wholesale electricity which the utility offered to "wheel."[11] The utility has under development several nuclear generators. No municipality has yet been terminated by the utility.
 
 
 9
 The trial court found that the utility in its service area has a monopoly of retail sales of electricity as well as a monopoly of the supply of wholesale electric power upon which the municipalities depend. Supported by the trial court's findings, the municipalities further point out that the utility and the municipalities are in competition for the right to serve all the customers in a municipality, referred to as "franchise competition." The municipalities claim that the utility has misused its monopoly power and the system of dual regulation. The trial court found that by seeking and permitting the wholesale rates to be higher and out of balance with lower retail rates, the utility was "price squeezing" the municipal systems into financial extinction and thereby was setting the stage for acquisition of municipal retail customers as its own. The trial court further found that the utility's rate program had been supplemented by threats to the continuation of wholesale power to the municipalities. Further the trial court found that competition had in the past been crippled and some municipal systems had been acquired by the utility.
 
 
 10
 The municipalities contend therefore that the utility has monopolized and attempted to monopolize the distribution and sale of electric power at retail in violation of Section 2 of the Sherman Act. The trial court found that to be the case and assessed treble damages in the amount of $12,148,175.11 computed by using as a basis the excess of wholesale rates over retail rates. In addition to the money judgment, the utility was enjoined "from monopolizing or attempting to monopolize the distribution and sale of electric power," from applying any different standard of energy curtailment on the municipalities than it apples to its own retail customers, and from charging a wholesale rate in excess of its retail rates unless any disparity is first approved by the federal commission. Some of those background facts will be considered in more detail as the legal issues are individually examined.
 
 APPLICABILITY OF NOERR-PENNINGTON DOCTRINE
 
 11
 The Noerr-Pennington doctrine is an outgrowth of Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). It shields from the Sherman Act as a constitutionally protected right of petition a concerted effort to influence public officials, regardless of intent or purpose. Thus the utility argues that its wholesale rate filings with the federal commission are within its constitutional right of petition and therefore immune from the Sherman Act. It was said in Noerr, however, that there may be instances of "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U.S. at 144, 81 S.Ct. at 533. The "mere sham" exception standing alone does not apply to this case. The trial court did not find that the federal tariff filings were "mere sham," but found instead that the utility filed for the highest rate it thought it could justify without any regard for the adverse competitive impact the new wholesale rate would have on the utility's wholesale municipal customers in competition with the utility at retail. The trial court found that to be a violation of Section 205 of the Federal Power Act,[12] as interpreted in Federal Power Commission v. Conway Corp., 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). Conway notes that Section 205(b) forbids a utility from granting any undue preference, subjecting anyone to any undue prejudice or disadvantage or maintaining any unreasonable differences in rates or services between classes of services. The federal commission was found to have jurisdiction to weigh and correct discriminatory effects in rate proceedings. There is a utility responsibility to avoid unreasonable differences in rates between classes of service.
 
 
 12
 In some contrast to that limited Conway finding is the trial court's broader view that all of the utility's acts and practices as a whole, its wholesale rate structure together with its statements threatening the power supply of the municipalities, its expressed preference in favor of its own retail customers and its policy of acquiring municipal distribution systems in distress, evidenced a specific intent to capitalize on and increase its monopoly power at the expense of the municipalities.
 
 
 13
 The Noerr-Pennington doctrine underwent some modification in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In that litigation between groups of competing highway carriers, it was charged that one group conspired to monopolize the transportation of goods by instituting various state and federal proceedings in agencies and courts to resist and defeat applications by the other group to acquire or transfer operating rights. The Court discusses the "sham" exception and its possible variations. The Court held that the conspirators sought not "to influence public officials," but to bar their competitors from meaningful participation in the decision-making process. Id. at 512, 92 S.Ct. at 612. The Court recognized that the allegedly conspiring group had a first amendment right of petition to be heard in agencies and courts in opposition to their competitors' applications, but that that right did not necessarily give the conspirators immunity from antitrust laws. The Court further noted that first amendment rights are not immunized from regulation when used to violate a valid statute. Id. at 514, 92 S.Ct. at 613. First amendment rights, the Court further explained, are not to be used as a means or pretext for achieving "substantive evils," and "(i)f the end result is unlawful, it matters not that the means used in violation may be lawful." Id. at 515, 92 S.Ct. at 614.
 
 
 14
 One claim . . . may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, viz., effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'
 
 
 15
 Petitioners, of course, have the right of access to the agencies and courts to be heard on application sought by competitive highway carriers. That right, as indicated, is part of the right of petition protected by the First Amendment. Yet that does not necessarily give them immunity from the antitrust laws.
 
 
 16
 Id. at 513, 92 S.Ct. at 613.
 
 
 17
 In an opinion in which he concurred on other grounds, Justice Stewart, joined by Justice Brennan, declared the majority opinion in California Motor Transport to be a retreat from Noerr. Id. at 516, 92 S.Ct. at 614.
 
 
 18
 It appears to us that the municipalities are not barred by Noerr-Pennington in the particular circumstances. Were we to view it otherwise, the federal and state regulatory processes would provide the utility with a method of effectively advancing its illegal monopolistic purposes while maintaining an outward appearance of total innocence and shielded from the Sherman Act. The utility violated the Federal Power Act, at least by its own admission in failing to weigh in advance the discriminatory effects of its differences in wholesale and retail rates. The utility was able to set its own wholesale rates for lengthy periods of time without regulatory interference. Before a prior wholesale rate had been adjudicated, the utility would, during the intervening period, file a new and higher superseding wholesale tariff which likewise automatically went into effect before adjudication. Later, whenever the federal commission managed to review a prior outdated tariff, it was found to be excessive and was reduced. No utility wholesale tariff yet filed by the utility has avoided reduction by the federal commission. When federal regulation actually occurs, the abuse is mildly remedied by refunds. Meanwhile, the victim municipalities have been continually living with unregulated wholesale rates.
 
 
 19
 That continuing situation appears to us to be an abuse of the administrative process tending to produce, with the other conduct of the utility, an illegal result. As in California Transport, the municipalities as utility competitors are being denied effective access to timely consideration by the federal commission by the maneuverings of the utility. Fair and effective access to the regulatory process is vital to the existence of the municipal systems. The utility's actions, akin to those in California Transport, should not be permitted to "acquire immunity by seeking refuge under the umbrella of 'political expression.' " Id. at 513, 92 S.Ct. at 613. The utility cannot be heard to say that it does not know its wholesale rates will have an impact on the municipalities in their retail competition. The dual regulatory process is being taken undue advantage of by the utility, thwarting the intended balance of federal and state regulation.
 
 
 20
 The additional actions of the utility in threatening the continued future wholesale supply of the municipalities and expressing an intention to prefer its own retail customers over its wholesale municipal customers adds to the uncertain plight of the municipal systems. That the utility threats were politely interlaced with unrealistic alternatives for sources of power suggested by the utility does not change their import. The evidence explored the possibilities of the municipalities avoiding the monopoly impact by constructing their own generating systems. It was found not to be economically feasible for the municipalities singly, nor even jointly to generate their own power in less than five years. Interconnecting and wheeling from other sources were considered, but no feasible municipal solution could be found. Utility monopoly power over the municipalities appears to be effective and complete. It is difficult to understand how the utility argument, which it advances in justification, that it would conserve its possibly scarce power by converting municipal retail customers into its own retail customers would remedy any power shortage.
 
 
 21
 The utility deserves no credit for originality in these maneuvers. One commentator notes that it is not an uncommon practice for a private electric company to refuse to sell bulk power to a municipally owned system because of competition from local distributing companies.[13] Another notes that a monopolist can evade regulation with ease by use of a "price squeeze."[14]
 
 
 22
 The utility in the past has shown some appetite for acquiring faltering municipal systems. The trial court in its opinion took note that the utility has had a policy of taking over municipal electric utilities and since 1957 had purchased or leased five in the area thereby converting municipal retail customers into its own.
 
 
 23
 Considering the combination of those utility activities this case is not precluded by Noerr-Pennington.
 
 THE "PRICE SQUEEZE" CHARGE
 
 24
 One of the principal issues of this case is the finding that the utility violated Section 2 of the Sherman Act by creating and maintaining a "price squeeze." The utility disputes the legal and factual basis for that determination. First, the utility charges the trial court left "price squeeze" undefined, but that even so there was no showing of a price squeeze or of an intent to create one. That the trial court did not specifically define "price squeeze" is not surprising as the parties used the term with familiarity throughout the proceedings, although they now differ about its application. The fault lies, if there is any, the utility argues, with the diverse regulatory procedures which preclude parity between wholesale and retail rates.
 
 
 25
 There is some substance to the utility regulatory argument. As we have already noted, the wholesale rates under federal control go into effect automatically without agency approval, but the state retail rates must await state approval. Behind the rate applications there are differing regulatory procedures, differing tests and standards to be applied, and differing accounting principles to be used in the computations. At best, a utility may find itself in a legal and practical maze, but for price squeezing the dual system also offers an obvious, ready made illegal opportunity with a legitimate gloss.
 
 
 26
 The utility strongly argues that no "price squeeze" intent was shown as the court relied on the wrong retail rates for comparison with wholesale rates to find a disparity. The trial court compared the rates, wholesale and retail, actually in effect under dual regulation at a particular time. The utility urges that the retail rates which should have been used for the analysis were the proposed retail rates which the utility was seeking from time to time pending state approval. If proposed retail rates had been used, the utility argues, the retail rates would have been in excess of wholesale rates and the municipalities would have shown a net benefit. The proposed retail rates not in effect reflect its intent, the utility claims, not the actual rates subsequently fixed by the state. The trial judge looked at the approved retail rates actually in effect, not at what the utility claimed the rate should be in the future.
 
 
 27
 It is apparent from this case that a higher rate is oftentimes sought which cannot be justified. To ask for more than one actually expects to receive is not an uncommon technique, usually with the hope that, even when discounted, the final amount will be greater than what would have resulted from a more realistic initial request. We see no need to make possibly unrealistic rate requests even more useful to a utility by converting those requests into self-serving measurements of intent for price squeeze purposes.
 
 
 28
 The federal commission for its purposes, which to some extent are different than ours, has recently changed its view. In Missouri Power Company, FERC Opinion No. 31, 16 F.P.S. 5 265 (1978), the federal commission abandoned its prior holding in Boston Edison Co., FPC Opinion No. 809 (1977), to the effect that the retail rate as filed could be used for comparison with the wholesale rate. Missouri Power holds that intent is irrelevant and that the retail rates actually in effect will be used for comparisons. The utility argues that the trial judge has done the same thing for antitrust purposes and in effect has held that intent is not a price squeeze necessity. We do not see the trial judge's decision that way. We are considering a "price squeeze" allegation, but that is not all we are considering. The "price squeeze" is only a part of the utility's conduct which as a whole was found to violate the Sherman Act.
 
 
 29
 In his findings, the trial judge found that the utility had never adopted a policy that its wholesale rate filings should be tailored to prevent its wholesale rates from being higher than its actual retail rates in effect. Further, the court found that the utility offered no evidence to justify the disparity in wholesale and retail rates nor did the utility ever seek to lower wholesale rates to parity with retail rates. Moreover, the court found that the utility monitored the operations of its wholesale municipal customers and aggressively pursued acquisition of faltering municipal utilities. The utility recognized, the court found, that profitable and efficient municipal utilities did not represent likely prospects for purchase. The utility remains interested in acquisitions the court found. It also found that the utility was aware of the importance of rate comparisons by municipal voters considering the possible sale of their municipal utility. And, as might be expected, the court also found that the utility realized that its wholesale rates would inevitably affect the municipal retail rates.
 
 
 30
 The trial court determined that a Section 2 Sherman Act violation had been established when monopoly power was shown, even though lawfully acquired, along with only a general intent to abuse that power resulting in injury to the municipalities. Sargent-Welch Scientific Co. v. Ventron Corp., 567 F.2d 701 (7th Cir. 1977), cert. denied, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). The utility argues, however, that to prevail the municipalities must establish "predatory" practices. The trial court went further, however, holding that, even if specific intent were required, the evidence met that standard. The trial court inferred utility intent to impair plaintiffs' competitive ability and the desire to preserve and expand its own existing monopoly from a consideration of the evidence in its entirety, including in general the continuing wholesale and retail rate disparity, threats to the municipal wholesale power supplies, and the utility policy of acquisition of municipal systems.
 
 
 31
 In Sargent-Welch, we relied on United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). In Griffith, it was held that it is not always necessary to find specific intent lest it crippled the Sherman Act. Id. at 105, 68 S.Ct. at 944. In the particular circumstances, however, of a regulated utility struggling with dual regulation, bearing in mind that the utility is entitled to recover its cost of service and to provide its investors with a reasonable rate of return, we believe that something more than general intent should be required to establish a Sherman Act violation. The utility charges that the trial court in fact read the requirement of any intent out of the Sherman Act. We disagree. The trial court discerned from a consideration of all the evidence of the utility's activities, not only a general intent which it considered to be adequate, but also a specific utility intent to serve its monopolistic purposes at municipal expense. We concur in that assessment of the evidence as a whole.
 
 
 32
 In this case, we are considering an industry subject to both federal and state regulation. However, we do not believe that that circumstance justifies an antitrust exemption on the basis that the utility is acting pursuant to mandates by a federal or state controlling body as urged by the utility in reliance on Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The evidence shows, the utility argues, that but for the state action in reducing the proposed retail rates there would have been no price squeeze. Parker v. Brown is inapposite. In that case a California producer of raisins brought suit in federal court to enjoin enforcement of a state agricultural proration program because it allegedly violated the federal antitrust laws. The Court assumed that the program would violate the Sherman Act if it were organized and operated by private persons, but held that the Sherman Act's purpose was not to restrain a state or its agents from activities directed by its own legislature. In contrast, it was pointed out, however, that a state cannot grant Sherman Act immunity by authorizing someone else to violate the Act, or by declaring other previous actions to be lawful. Id. at 351, 63 S.Ct. at 313. In the present case, Indiana and Michigan have not in any way attempted to create, approve or mandate a Sherman Act violation, nor has the federal agency. The utility has no basis to immunize its own activities with any Parker v. Brown type of exemption.
 
 
 33
 Among other things the court found that the utility unlawfully jeopardized the supply of municipal wholesale power. The utility attacks that finding on several grounds. The utility argues that it could not terminate wholesale service without the approval of the commission and it had never sought that approval. Nor did it have any obligation, it argues, to contract to supply municipalities with unlimited power in perpetuity. That those arguments may be factually correct does not change the impact of those utility warnings on the municipalities when considered in the context of all the evidence. There was no realistic substitute source of wholesale power for the municipalities to turn to. The utility warnings alone would not constitute an illegal act, but in the context of the whole case the utility threats may be seen in a different light. They appear to be another element of the utility's monopoly enhancement program. Similar warnings of power curtailment were not given by the utility to its own retail customers nor to municipalities which were not the utility's wholesale customers and in which the utility had retail customers. It was not shown how conversion of municipal retail customers to utility retail customers would conserve power. We see no need to set forth here in detail the evidentiary basis of the trial court's findings with which we are in accord.OTHER LEGAL ISSUES
 
 
 34
 The municipalities had the burden of showing injurious anticompetitive conduct by the utility in violation of the Sherman Act in order to be entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15; Peller v. International Boxing Club, 227 F.2d 593 (7th Cir. 1955). The district court found that the utility and the municipal utilities competed for individual customers some of whom had the option of locating in the municipal area, or relocating outside the area, or expanding. The court likewise found some competition in adjacent areas where the customer might have a choice, and also in areas into which the municipal utility might expand. There was also evidence of competition for established customers of the utility within the municipal area. The competition which the court found most significant, however, was franchise competition, that is, that the utility competed to acquire or replace the municipal distribution systems so as to become the retail supplier of their customers. The evidence shows in varying degrees what the competition was for the various categories. The finding of franchise competition is based on a history of acquisitions and leases of municipal systems by the utility beginning in 1957. There were also utility attempts to acquire certain municipal systems and also interest expressed by the utility in acquiring others in the relevant service area extending into 1977. Those findings are disputed.
 
 
 35
 The utility argues that the takeovers were all approved and in the public interest. It was the trial court's view that the utility's use of the diverse rate regulation structure and its other acts contributed to a municipal system's vulnerability to utility takeover. Mere acquisition would not necessarily constitute a violation, but the violation was found to come from the anticompetitive practices of the utility as a whole which helped produce the acquisition opportunities. We believe the trial court was justified in coming to those conclusions based on the evidence and the reasonable inferences to be drawn therefrom.
 
 
 36
 The trial court found that competition had suffered antitrust injury in various ways. The municipalities had to increase their retail rates in some cases absorb portions of the increases without passing them on. Overall, the municipalities were impaired in their ability to offer competitive rates and service to present and potential customers, and, in addition, municipal citizens were deprived of the full benefits normally expected to be derived from the operation of their own facilities. The threats to power supply, it was found, inhibited growth and the attraction of new business ventures into their areas. We are not prepared to set those findings aside as clearly erroneous.
 
 
 37
 The utility would have us consider each separate aspect of its conduct separately and in a vacuum. If we did, we might agree with the utility that no one aspect standing alone is illegal. It is the mix of the various ingredients of utility behavior in a monopoly broth that produces the unsavory flavor. We have recognized previously that "(t)here are kinds of acts which would be lawful in the absence of monopoly but, because of their tendency to foreclose competitors from access to markets or customers or some other inherently anticompetitive tendency, are unlawful under § 2 if done by a monopolist . . . ." Sargent-Welch, 567 F.2d at 711-12. Injury need not be conclusively shown, but the evidence must be sufficient to sustain the inference of injury to some extent. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114, 89 S.Ct. 1562, 1571, 23 L.Ed.2d 129 (1969). We believe that standard has been satisfied here. The possibility of refunds if the wholesale rate is determined to be too high is not a complete cure for the illegal activities of the utility.
 
 DAMAGES
 
 38
 In awarding damages to the municipalities the trial court relied upon the analysis of monopolistic overcharges set forth in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 489, 88 S.Ct. 2224, 2229, 20 L.Ed.2d 1231 (1968), and found that the evidence established "two kinds" of monopolistic overcharges. First, the court found that the utility had charged the municipalities wholesale rates from 1972 to 1976 which were subsequently held to be unjust and unreasonable by the Federal Energy Regulatory Commission. Second, the court found that the municipalities had been overcharged by the amount the wholesale rates charged them exceeded the amounts which they would have been charged under the utility's retail rates actually in effect. The court proceeded to award damages based solely on a tripling of the difference between the higher wholesale rates paid by the municipalities and the lower retail rates which the utility actually charged its retail customers for the period from August 1976 through August 1978. Treble damages were found to exceed twelve million dollars. No other factor entered into the computation.
 
 
 39
 The formula used by the trial court is recommended by its simplicity, but the computation of damages should not be expected to be quite that much easier than the rest of this case. While the municipalities argue that there is no other way to determine their damages, we are not satisfied that this is true.
 
 
 40
 We recognize that the burden of proof of the municipalities as to the amount of damages is less than that required for proof of antitrust injury. It need not be precise. A just and reasonable estimate of damage based on relevant data may suffice even if also based upon probable or inferential proof. This standard does not, however, permit speculation or guesswork even though the defendant by its own wrongdoing has made precision impossible. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. at 123-24, 89 S.Ct. at 1576-77; Bigelow v. RKO Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).
 
 
 41
 The municipalities rely on Hanover Shoe, supra, both to support the trial court's findings of injury and also to establish a formula for determining the amount of the damages. Particularly, they rely, as did the trial court, on the following quotation from Hanover Shoe:
 
 
 42
 (W)hen a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4.
 
 
 43
 392 U.S. at 489, 88 S.Ct. at 2229. In our view, Hanover Shoe is not fully applicable in either regard in the circumstances of this case, where the defendant is subject to dual regulation and any overcharge in wholesale rates later found to exist by the federal commission is to be refunded with 9% interest.
 
 
 44
 As an initial matter, assuming arguendo that the Hanover Shoe monopolistic overcharge analysis is fully applicable to the facts of this case, we find no justification for the trial court's determination that the difference between the wholesale rates in effect prior to commission review and the retail rates actually charged is an accurate measure of the overcharge. As we have already observed, the state and federal regulatory schemes to which the utility is subject utilize different accounting practices, as well as different formulae and criteria for determining what are fair and reasonable rates. Moreover, in all likelihood, the utility has dissimilar fixed and variable cost requirements which it must seek to cover in its respective wholesale and retail rates. Under these circumstances, we find the trial court's apparent assumption that, absent the monopolistic overcharge, there would be equivalent wholesale and retail rates actually in effect and that the monopolistic overcharge was therefore the difference between the unreviewed higher wholesale rates and the approved retail rates to be totally without foundation.[15]
 
 
 45
 Assuming that an overcharge analysis is determinative of the measure of damages in this case, we conclude that the overcharge which the utility has received by its unilateral imposition of excessive wholesale rates prior to federal regulatory review is, more accurately, the amount which the federal commission ultimately orders refunded based on its determination that the wholesale rate charged was unreasonable and excessive. In recommending this method for calculating the overcharge, we recognize that the computation of antitrust damages is uniquely within the province of the federal courts.
 
 
 46
 Conceivably, we could remand this case to the district court for a determination of that portion of the utility's wholesale rate filings which is unreasonable and excessive. However, such a procedure might entail needless duplication of effort by the district court where the federal commission is both already in the process of making the identical determination and has substantially greater expertise in the area.
 
 
 47
 It is clear after Conway, moreover, that the federal commission is required to consider any anticompetitive price squeeze resulting from jurisdictional wholesale rates and non-jurisdictional retail rates in fixing rates for interstate wholesale sales. Given these considerations, we would conclude that the commission's ultimate refund is the most accurate measure of the overcharge which the utility has been able to gather as a result of its unlawful activities.[16] On the other hand, if it does not desire to await a determination by the federal commission, the court might properly consider the overcharge which the commission found for the period 1972-1976 and endeavor to estimate the probable overcharge for the later period.
 
 
 48
 More fundamentally, however, we find the trial court's and the municipalities' reliance upon the Hanover Shoe overcharge analysis to be unsupportable in the instant case. In Hanover Shoe, a shoe manufacturer prevailed on its claim that its supplier, a manufacturer of shoe-making machinery, had monopolized the shoe machinery industry and that the policy of exclusively leasing, rather than selling, the machinery was an instrument of the monopolization. Damages were awarded on a tripling of the difference between what the manufacturer had to pay in rentals and what it would have paid had its supplier been willing to sell the machines. The monopolistic "overcharge" in Hanover Shoe was recoverable solely because the plaintiff had successfully proven its antitrust charges: absent the antitrust action, the plaintiff would have continuously suffered the overcharge arising from the defendant's abuse of its monopolistic position.
 
 
 49
 Unlike Hanover Shoe, the utility here is not in a position to indefinitely retain the proceeds of any excessive wholesale charges. The commission is required by statute to determine whether the utility's filed wholesale rates are fair, just and reasonable. 16 U.S.C. § 824d(a). If it finds the filed wholesale rates to be excessive or unreasonable, the commission requires the utility to refund to its wholesale customers the exact amount which it has charged and collected in excess of that determined to be just and reasonable. These refunds include interest on the excess at the rate of 9%. Thus, the federal regulatory statute provides the municipalities with a system by which the utility's overcharges are automatically and necessarily restored to them with interest.
 
 
 50
 Given this federal regulatory system which is designed to curb the utility's abuse of its monopoly power and which guarantees ultimate restoration to the wholesale customers of the "overcharge" unlawfully extracted from them, we are not convinced that the utility's temporary monopolistic overcharge is an accurate measure of the antitrust damages which the municipalities have endured. Rather, under the sui generis circumstances of this case,[17] we believe that the municipalities must establish their antitrust damages by proof of specific injuries they have suffered as a result of the utility's overcharges and other monopolistic practices.
 
 
 51
 This conclusion by no means narrowly limits the municipalities' ability to establish damages. Insofar as they have suffered injury in their "franchise competition" with the utility, the municipalities may be able to demonstrate, for example, that the 9% rate of interest fails to make them whole for the loss of the use of the monies which they were overcharged, or that the excessively high wholesale rates forced them to forego altogether or to secure less favorable terms for capital improvements to expand their municipal distribution facilities or to replace obsolete equipment, etc. Insofar as the municipalities have been injured in their ability to compete directly with the utility for the provision of service to retail customers in areas of overlapping service, the municipalities may be able to show a loss of customers, revenue and profits. Our discussion here is not meant to be exhaustive, but merely to illustrate that the municipalities on remand must introduce proof of damages which were caused by the utility's monopolistic conduct.
 
 
 52
 We also find that the municipalities are entitled to recover, as part of their antitrust damages, the expenses they incurred in litigating before the commission in their attempt to prevent the utility's withdrawal of their wholesale supply as had been threatened. The litigation expenses sought are not for opposing utility rate applications. In the context of this antitrust violation, we do not believe that to allow litigation expenses to the municipalities for efforts to counteract the threats and to protect their municipal systems runs afoul of Noerr-Pennington as claimed by the utility. It was not the utility petitioning for its own lawful purposes. It was the municipalities petitioning to prevent the utility's allegedly unlawful conduct.
 
 
 53
 Support for our award of these litigation expenses as a portion of antitrust damages may be found in this court's earlier decisions awarding litigation expenses undertaken in defense of patent infringement litigation as an element of antitrust damages. In Dairy Foods, Inc. v. Dairy Maid Products Cooperative, 297 F.2d 805, 808-09 (7th Cir. 1961), we held that, where a patent "infringement suit was brought as part of and in furtherance of a combination and conspiracy which violates the antitrust laws and results in injury" such that the defendant was put to the choice of (1) foregoing use of the patented device, (2) accepting a discriminatory and restrictive license which increased the cost of production, or (3) defending expensive patent litigation, the cost and expense of defending the suit was a component of antitrust damages which could be trebled. See also Locklin v. Day-Glo Color Corp., 429 F.2d 873, 878 & n. 13 (7th Cir. 1970), cert. denied, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971); Hazeltine Research, Inc. v. Zenith Radio Corp., Inc., 388 F.2d 25, 35 (7th Cir. 1967), aff'd in part and rev'd in part, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).
 
 
 54
 Similarly, in this case, the trial court found that the municipalities had no choice but to file an administrative action before the commission to prevent the loss of their wholesale power source and to establish their right to equal treatment with the utility's retail customers whom the utility had indicated would receive preferences. Under these circumstances, we find no merit in the utility's contention that the cases discussed above should be narrowly limited to situations where the prevailing antitrust plaintiff had been forced to defend patent infringement litigation.
 
 
 55
 Accordingly, we vacate the award of damages and remand to the district court for such further proceedings as may be necessary to determine the municipalities' damages. Whereas the trial court earlier found damages with reference only to the period from August 1976 through August 1978, on remand the court may consider damages suffered during the period covered by the complaint in which the utility's unlawful activities occurred. On remand, the court shall also consider whether any portion of the municipalities' damages is barred as a result of the negotiated settlement reached by the municipalities and the utility with respect to the utility's wholesale rate schedule for the period from January 13, 1973 to July 27, 1976.
 
 INJUNCTIVE RELIEF
 
 56
 In Mishawaka I, we anticipated the injunctive relief permitted under Section 16 of the Clayton Act, 15 U.S.C. § 26, provided it would not interfere with rates approved by the commission, cause conflict or preempt commission jurisdiction. That is not an easy task. The courts should not be in the rate fixing business. The court, however, is faced with indefinitely permitting a price squeeze or trying to cause some adjustment of the rates. As was argued in Mishawaka I, delay to determine what rates may be finally approved by the commission may only result in authorizing "refunds to a corpse." Even though the commission cannot afford complete antitrust relief, we repeat our expressed thoughts in Mishawaka I that though a stay of further proceedings need not be granted, the district court remains free to determine anew, in view of the substantial amount of time which has now passed in this litigation, whether or not in the immediate circumstances it may be beneficial to await and ascertain particular commission action in order to decide the exact scope of antitrust damages, or for other purposes.
 
 
 57
 The trial court in its Judgment Order enjoined the utility in various respects to which the utility objects.[18] The injunction was drafted by municipal counsel and issued by the trial court without the benefit of a hearing as to its nature and scope. Particularly in the circumstances of this case we believe a hearing would have been beneficial.
 
 
 58
 We agree with the utility that paragraph 2 of the injunction is too vague to identify any specific activity which may be subject to the contempt power. Paragraph 2 merely incorporates the broad language of Section 2 of the Sherman Act. Rule 65(d), Fed.R.Civ.P., provides that every injunction shall be specific in its terms and shall describe in reasonable detail the acts sought to be restrained. The standard established by Rule 65(d) "is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." 11 C. Wright & A. Miller, Federal Practice and Procedure § 2955 at 536-37 (1973). To enjoin in the language of the Sherman Act obviously fails to meet that test.
 
 
 59
 This litigation demonstrates the difficulties of simply applying Sherman Act language to particular circumstances. We also agree that portions of paragraphs 3 and 4 of the injunction are properly subject to similar objections. It would be difficult to ascertain in advance, for example, what conduct is proscribed in paragraphs 3 and 4 by the requirement that the utility treat all its customers fairly, equitably and on a nondiscriminatory basis.
 
 
 60
 Paragraph 5 is attacked as being in conflict with Section 205 of the Federal Power Act governing rates and charges, as an intrusion by the court into the rate making process and also as being vague in some of its requirements. The thrust of paragraph 5 seems to be to impose certain requirements for new filings and in the meantime to roll back wholesale rates to the same level as the retail rates in effect. Rolling back the present wholesale rate may be seen as some temporary improvement in the rate structure, but unfortunately it is not the result of a knowledgeable effort to tailor the rates to bring them within some zone of reasonableness to achieve fair wholesale and retail competition. See Federal Power Commission v. Conway Corp., 426 U.S. at 278, 96 S.Ct. at 2004. To set wholesale rates and retail rates at the same level for an extended length of time ignores the economic justification for the recognized distinction between wholesale and retail. On a short term interim basis to do so may alleviate, but will not solve the problem. Also, it may be, given the differing characteristics of the various regulating bodies, that for some reasonable time some excess of wholesale rates over retail rates may be justified in order for the utility to be able to achieve a proper rate balance through the normal functioning of the regulating bodies. We believe more flexibility is required in the order so as to permit the utility an opportunity to justify some short term variations. To require the utility to comply indefinitely with paragraph 5 of the injunction prohibiting it from charging a wholesale rate not actually approved by the federal commission amends the Federal Power Act. It is only the antitrust violation found to exist in this case from a combination of circumstances which justifies temporary control of the wholesale rates by the court. When, however, assuming the absence of other anticompetitive activities, the utility demonstrates a good faith effort to comply with its Conway obligations so as to avoid anticompetitive effects, the court should return rate control to the regulating commissions established respectively by Congress and the state legislatures for that purpose.
 
 
 61
 It may also be feasible to require the parties to seek expedited consideration of the rate filings from the federal commission and state agencies in view of the existing serious antitrust complications found to exist in the combination of circumstances in this case. Even though Sherman Act jurisdiction lies with the court, there is no prohibition against a common expedited effort by the parties and the other governmental agencies to cooperate and assist each other in an expeditious resolution of these mutual problems. Although the federal and state commissions are not parties to this litigation the court may require those who are parties to seek to bring together cooperative federal and state consideration and solution of these rate problems. The Federal Power Act makes it clear that the federal commission is not expected to function in isolation. Section 209(b), 16 U.S.C. § 824h(b), allows federal and state commission cooperation with regard to rate structures and other matters. Other sections of the Act also anticipate a working federal-state relationship.[19] Conway Corp. v. Federal Power Commission, 167 U.S.App.D.C. 43, 51, 510 F.2d 1264, 1272 (D.C.Cir. 1975), aff'd, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). It may be, pending some congressional or legislative adjustment in procedures, that only through an expeditious and cooperative effort by the federal and state agencies to apply their expertise to this type of problem will the present regulatory systems have any reasonable chance of success.
 
 
 62
 The injunction is vacated and upon remand the trial court may, after hearing, devise a more specific injunction being careful not to encroach any further on the rate making process than may be temporarily required by antitrust considerations. As we have already noted, the injunction was issued by the trial court without the benefit of a hearing. Therefore the ramifications and complications of the injunction are not explored in the record. We believe a hearing on the injunction will be most helpful to the trial court. We do not intend to inhibit or confine the trial court merely to some modification of the present injunction. It is expected that a new effort be made to fashion a suitable injunction in keeping with the general principles expressed in Mishawaka I and in this opinion.
 
 
 63
 The trial court is affirmed in part. The damage and injunctive provisions are vacated and remanded for additional proceedings in conformity with this opinion. The parties shall bear their own costs of this appeal.
 
 
 
 *
 The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Judge Will made substantial contributions to this opinion and in particular to the section on damages
 
 
 [2]
 15 U.S.C. § 2
 
 
 [3]
 The Federal Energy Regulatory Commission was formerly known as the Federal Power Commission
 
 
 [4]
 The term "price squeeze" as used in this context refers to a situation where the monopolist charges its wholesale customer a wholesale rate high enough to impede that customer's competition with the monopolist in the retail market
 
 
 [5]
 The opinion of Judge Sharp is reported in City of Mishawaka, Indiana v. American Electric Power Co., 465 F.Supp. 1320 (N.D.Ind.1979), and is the subject of a recent Note, Antitrust Price Squeeze, 12 Ind.L.Rev. 637 (1979)
 
 
 [6]
 City of Mishawaka, Indiana v. Indiana & Michigan Electric Co., 560 F.2d 1314 (7th Cir. 1977), cert. denied, 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978)
 
 
 [7]
 We have had the assistance of separate briefs filed by amici curiae Edison Electric Institute, Commonwealth Edison Company, and jointly by the cities of Anderson and Auburn, Indiana
 
 
 [8]
 On the general subject of the application of antitrust laws to regulated industries the following articles may be of interest: Hale & Hale, The Otter Tail Power Case: Regulation by Commission or Antitrust Laws, 1973 Sup.Ct.Rev. 99; Hale & Hale, Competition or Control VI: Application of Antitrust Laws to Regulated Industries, 111 U.Pa.L.Rev. 46 (1962); Jones, Marketing Strategy and Government Regulation in Dual Distribution Practices, 34 Geo.Wash.L.Rev. 456 (1966); Meeks, Concentration in the Electric Power Industry: The Impact of Antitrust Policy, 72 Colum.L.Rev. 64 (1972); Note, Regulated Industries and the Antitrust Laws: Substantive and Procedural Coordination, 58 Colum.L.Rev. 673 (1958); Note, Refusals to Deal by Vertically Integrated Monopolists, 87 Harv.L.Rev. 1720 (1974); Comment, Otter Tail and Its Import for Regulated Utilities, 9 Wake Forest L.Rev. 407 (1973)
 
 
 [9]
 Indiana & Michigan Electric Company generates, transmits and sells electricity. American Electric Power Company, Inc., is an investor-owned public holding company under the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 et seq. American Electric Power Service Corporation, also a subsidiary of American Electric Power, provides management, professional and technical services to Indiana & Michigan Electric
 
 
 [10]
 Federal Power Act, 16 U.S.C. § 824
 
 
 [11]
 "Wheeling" is a convenient industry term for transmitting electricity from source to customer over the line facilities of a third party
 
 
 [12]
 16 U.S.C. § 824d
 
 
 [13]
 Comment, supra note 8, at 410
 
 
 [14]
 Note, Refusals to Deal by Vertically Integrated Monopolists, supra note 8, at 1758
 
 
 [15]
 The apparent lack of foundation for this assumption is confirmed by the fact that for the period 1972-1976, after the utility's wholesale rates were reviewed by an ALJ for the federal commission and found to be excessive, the ultimate adjustment reached by the utility and the municipalities was such that the aggregate amount paid by the municipalities under the wholesale rates was substantially less than the amounts they would have paid under the utility's retail rates
 
 
 [16]
 In this court's earlier decision, we noted the possibility that a utility's retail rates might be set so low that the commission would be without authority to correspondingly set the jurisdictional wholesale rate sufficiently low to eliminate the price squeeze. 560 F.2d at 1323. This problem arises because the commission is without power to set wholesale rates below the lower boundary of the zone of reasonableness and has no authority over the retail rates. Id. at 1319. Assuming such possibility were present in this case, the ultimate refund awarded by the commission might not be equivalent to the utility's monopolistic overcharge
 There is no indication, however, that this is such a case. There is no suggestion that the utility deliberately depressed its retail rates to create a price squeeze; in fact, a substantial portion of the disparity between the utility's retail and wholesale rates apparently arises from the fact that the utility did not receive favorable consideration by the state commissions on several of its retail rate filings. Under such circumstances, we would have great difficulty concluding that the utility is to be held accountable for any "overcharge" in its wholesale rates beyond the refund awarded by the commission. Anticompetitive effects from this portion of the price squeeze, absent evidence that the utility deliberately depressed its retail rates, must be attributed to the state regulatory commissions and not to the utility.
 
 
 [17]
 Amici Commonwealth Edison Co. and the Edison Electric Institute, relying primarily upon ICC v. United States ex rel. Campbell, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273 (1933), argue that this case should be analogized to a "price discrimination" rather than an "overcharge," and that antitrust damages should consequently be measured by the municipalities' business loss rather than by the difference between retail and wholesale prices. Review of the cases cited by Amici, however, provides scant guidance in the instant situation
 Campbell involved a shipper's effort to mandamus the Interstate Commerce Commission, where the Commission had refused to award the shipper damages in a situation where the shipper had paid rates determined by the Commission to be reasonable in amount but which, at the same time, were discriminatory. Under these circumstances, the Supreme Court distinguished between the damages arising from an overcharge and a discrimination: "When discrimination and that alone is the gist of the offense, the difference between one rate and another is not the measure of damages suffered by the shipper." 289 U.S. 389, 53 S.Ct. 609. Apart from the fact that Campbell did not arise under the antitrust laws, we do not find its analysis helpful here where the utility can (and did) unilaterally impose excessive wholesale rates, subject to future commission review and future refunds, in an effort to monopolize the distribution of power in its service area.
 No case cited by either party or any amicus provides substantial insight into how antitrust damages should be measured in this context of dual regulation of the utility's wholesale and retail rates.
 
 
 [18]
 The Judgment Order in pertinent part provides:
 
 
 [2]
 Defendants American Electric Power Company, Inc., American Electric Power Service Corporation, and Indiana & Michigan Electric Company, their officers, agents, successors and all persons acting in concert with them are hereby enjoined from monopolizing or attempting to monopolize the distribution and sale of electric power at retail within defendant I&M's service area or within any of the plaintiff municipalities, in violation of 15 U.S.C. § 2
 
 
 [3]
 Defendant Indiana & Michigan Electric Company, its officers, agents, successors and all persons acting in concert with it, are hereby enjoined from discriminating against I&M's wholesale municipal customers in rates, terms, or conditions of service; from taking any action that will have the effect of singling out I&M's wholesale municipal customers for the purpose of indicating directly or indirectly that the continuity of service for only that class of customers may be in jeopardy or that the supply of electric power and energy to those municipal utilities and their customers may be curtailed on different terms from those applied to I&M's retail customers; and from failing to perform I&M's obligation to serve each of the plaintiffs, as well as its other customers, fairly, equitably and on a nondiscriminatory basis as long as I&M conducts a public utility business in their area
 
 
 [4]
 Defendants American Electric Power Company, Inc., and American Electric Power Service Corporation, their officers, agents, successors and all persons acting in concert with them, are hereby enjoined from discriminating or causing I&M to discriminate against I&M's wholesale municipal customers in rates, terms, or conditions of service; from taking any action that will have the effect of singling out I&M's wholesale municipal customers for the purpose of indicating directly or indirectly that the continuity of service for only that class of customers may be in jeopardy or that the supply of electric power and energy to those municipal utilities and their customers may be curtailed on different terms from those applied to I&M's performance of its obligation to serve each of the plaintiffs, as well as I&M's other customers, fairly, equitably and on a nondiscriminatory basis as long as I&M conducts a public utility business in their area
 
 
 [5]
 In preparing and filing new wholesale rates for electric service to any of the plaintiff municipalities, the defendants (1) shall project the billing determinants for each plaintiff for the first year the new wholesale rate will be in effect, as requested by I&M's wholesale rate filing, and (2) shall compare the projected billings to each plaintiff under the proposed wholesale rate against the amount that plaintiff would pay under I&M's retail rates in effect at the time the wholesale rate is filed. The defendant I&M is enjoined from putting into effect or charging any of the plaintiffs a wholesale rate under which the projected billings to any plaintiff exceed the amount that plaintiff would pay under I&M's retail rates in effect at the time the wholesale rate is filed, unless and until the Federal Energy Regulatory Commission determines that that wholesale rate is just and reasonable
 
 
 [19]
 For example, section 311, 16 U.S.C. § 825j, pertains to investigations of matters, in this case retail rates, not subject to federal jurisdiction, and section 202(a), 16 U.S.C. § 824a(a), provides for notice to state commissioners