HOPE, INC., an Illinois not-for-profit
corporation, et al.,
Plaintiffs-Appellees,

v.

The COUNTY OF DuPAGE, ILLINOIS,
et al., Defendants-Appellants.

No. 82–1215.

United States Court of Appeals,
Seventh Circuit.

Argued June 1, 1982.

Reargued Jan. 19, 1984.

Decided June 26, 1984.

Don H. Reuben, Reuben & Proctor, Chicago, Ill., for defendants-appellants.

R. Dickey Hamilton, Krupp & Miller, Chicago, Ill., for plaintiffs-appellees.

Before PELL, WOOD, CUDAHY, ESCHBACH, POSNER, COFFEY and FLAUM, Circuit Judges.[*]

COFFEY, Circuit Judge.

The defendants appeal the district court's judgment and decree finding that the defendants "knowingly and intelligently pursued housing policies and practices which

[*] Chief Judge Cummings and Judge Bauer did not participate in the consideration of this case.

were intended to and effectively [did] exclude[ ] persons of low and moderate income and racial minorities from residing in the County." The decree permanently enjoined the defendants from "[e]ngaging in any conduct having the purpose or effect of perpetuating or promoting racial residential discrimination ... or of denying or abridging the right of any person to equal housing opportunity in DuPage County on account of race, color, or national origin...." In addition to this permanent injunction, the decree bars the County from enforcing a considerable portion of its zoning ordinance against housing projects intended for persons with low or moderate incomes, and further, requires the County to develop a 10-year plan to produce a significant number of housing units for low and moderate income families. On appeal, the defendants raise three issues: (1) whether any of the plaintiffs have alleged and/or proven facts sufficient to establish standing to litigate the present action; (2) whether the facts in the record sufficiently establish intentional invidious discrimination; and (3) whether the district court's decree is so unrelated to the plaintiffs' alleged and proven injuries that it should be vacated. We reverse.

I

The plaintiffs-appellees are ten individuals purporting to represent a class of low and moderate income persons seeking adequate housing in DuPage County, Illinois and HOPE, Inc., a not-for-profit corporation based in DuPage County whose purpose is to promote and locate adequate housing for low and moderate income persons. In 1971, the plaintiffs brought this action against DuPage County, Illinois, the members of the DuPage County Board, and certain private landowners and builder-developers alleging that they had engaged in "exclusionary housing practices" which effectively denied adequate housing to racial minorities and persons with low or moderate incomes. In addition, the plaintiffs alleged that the County, the members of the County Board and the defendant landowners and developers had entered into and effectuated a conspiracy to perpetuate the County's discriminatory housing practices.[1] Jurisdiction was based on 28 U.S.C. §§ 1331 and 1343. As the preceding allegations reflect, the plaintiffs claimed deprivation of rights protected by the Thirteenth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §§ 1981–83, 1985(3) and 2000d. The plaintiffs sought both declaratory and injunctive relief.

The defendants moved for summary judgment asserting that the plaintiffs lacked standing to sue because there was no actual case or controversy properly before the court as required by Article III of the Constitution as it had been interpreted by the United States Supreme Court in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The district court, in its initial ruling on standing, relied to a great extent on the plaintiffs' conspiracy allegations to distinguish the present case from the facts in *Warth.* Specifically, the court stated:

"Nevertheless, as in *Warth,* the plaintiffs have not alleged that the County rejected a proposed project in which they could have lived. The difference in this case is that the major reason plaintiffs cannot make such an allegation is the alleged conspiracy between the developers and the county."

*Planning for People Coalition v. DuPage Cty., Ill.,* 70 F.R.D. 38, 45–46 (N.D.Ill.1976). The court concluded that the individual plaintiffs had asserted the requisite personal injury to establish standing based on their allegations that absent the exclusionary practices of DuPage County and the conspiracy between the County and the developers to accomplish that exclusion, there was a substantial probability that the plaintiffs would be able to find housing in DuPage County adequate for their needs at a price they could afford. *See Id.* at 46–47.

1. It should be noted that all except one of the individual plaintiffs are or were at one time living in DuPage County during the pendency of the present suit.

With regard to the plaintiff HOPE, Inc., the district court found that it had standing in its representational capacity since the complaint alleged that a number of HOPE's directors were low or moderate income persons who were at the time actively seeking adequate housing in DuPage County.

The case was tried to the court. By agreement of the parties, the district court ordered the exchange of proposed stipulations of facts and evidence to facilitate the prompt presentation of evidence and to provide a substantially agreed upon factual record. Pursuant to that order, the parties stipulated to a considerable quantity of evidence. In addition to the stipulated materials, the district court conducted three-and-one-half days of hearings consisting of the testimony of certain County and Zoning Board members. Before passing judgment, the court attempted to obtain a negotiated settlement of the controversy and thus requested the Community Relations Service of the Department of Justice to mediate an agreement between the parties. These efforts failed, and in December of 1980, the court determined that a negotiated disposition was not possible.

On October 1, 1981, the district court concluded, in an exhaustive 101-page Findings of Fact, Conclusions of Law and Opinion, that the DuPage County defendants had in fact knowingly and intelligently engaged in housing practices which were intended to and effectively did exclude persons of low and moderate income and racial minorities from residing in the County. In support of its decision to provide equitable relief the district court also found that "DuPage County's housing policies and practices constitute a continuing threat of irreparable harm to plaintiffs and members of the plaintiff class who continue to seek low or moderate income housing in DuPage County." The district court did not, however, find a conspiracy between the developers and the County. Notwithstanding the plaintiffs' failure to prove the existence of a conspiracy, the court stated that the plaintiffs and the plaintiff class did establish "that they have been and continue to be injured by the actions of the defendants and that their inability to secure housing in DuPage County is fairly traceable to the County's actions." Based on this finding the court concluded that "they have standing to challenge those actions."

The trial judge in his determination that the County had pursued unconstitutional discriminatory housing practices examined a number of sources of information. Specifically, the court considered selected statements made by County officials, certain actions of the County Board, statements made during zoning board meetings, and certain statistical data. The most significant of these statements and facts relied upon by the court are listed below:

1. In 1971, Mr. James H. Clark, the then Collector and Treasurer of DuPage County, co-authored an article entitled "Suburbia High Taxes, The Dream Becomes a Nightmare," that appeared in the *Chicago Tribune*, in which the following statement was made:

"Another new issue in the suburbs is housing for low income people. Low income housing in DuPage County is like buying a case of cancer. It would result in too many people with too little tax revenue to pay for services—again, primarily schools—needed by these people."

Following publication of this article Clark had a substantial number of copies printed which he distributed to persons who complained about their taxes.

Mr. Clark was not a member of the DuPage County Board (nor was he named as a defendant in this action). He did, however, from time to time make recommendations to the DuPage County Zoning Board and on one particular occasion opposed a zoning variance for a project because the proposal included three-bedroom apartment units. Once the three-bedroom units were eliminated from the plan, Mr. Clark withdrew his opposition to the development and recommended approval. In his letter recommending approval of the project, as modified, Mr. Clark noted that the intended property for the development was, in his

view, the last one of the remaining open spaces that could be used to generate a large tax asset without in addition creating an influx of a great number of children.

2. Gerald R. Weeks, elected to the County Board in 1963 and selected as its Chairman in 1970, was quoted in an article, appearing in the *Chicago Tribune* on March 31, 1971, concerning the NAACP's announcement that it planned an integrated city development in DuPage County that would include low and moderate income housing. According to that article:

"Board Chairman Gerald R. Weeks (R-Milton Twp.) said the NAACP, if it goes ahead with the plans, will help the board prove that the county does not practice exclusion. 'They'll find out they'll be treated just like everybody else,' he said. Weeks said the NAACP housing will be welcomed if it conforms to the county's zoning laws. But, he said, the housing will not be welcomed 'if they want us to lift the laws so they can build fire traps and slums.' "

At his deposition Mr. Weeks attempted to clarify this statement by testifying that his reference to "the laws" meant the local building codes.

3. Fred Koebeman, a member of both the DuPage County Board and the Zoning Committee, when asked at a public meeting whether he favored the proposed NAACP project, replied that he did not.

4. On March 5, 1971, the Executive Committee of the DuPage County Board met with the city manager of Wheaton, Illinois (DuPage County), Wheaton's city attorney, and Wheaton's director of building and planning, to discuss the city's application to HUD for funds for low income housing. At that meeting the Executive Committee requested that the Wheaton officials divide the city's HUD application into two parts, one requesting funds for housing for elderly and the other requesting funds for housing for low income families. The County officials stated that there was no problem with respect to housing for the elderly, but that they knew their con-stituents were opposed to low income housing.

However, no action of the County Board caused the subsequent demise of the Wheaton low income housing proposal. As the district court pointed out:

"The proposal became a controversial issue in Wheaton in the spring 1971 elections for the Wheaton city council. A slate of candidates who opposed the application were victorious and at the first meeting after the election revoked the authority previously given to the DuPage Housing Authority to apply for HUD funds. As a result, the proposal and project were abandoned."

5. On May 31, 1978, the DuPage County Board, acting in the capacity of a HUD grantee, approved Glendale Heights' request for HUD funds. The original proposal only included subsidized housing for the elderly. After the original approval of funding by the County Board, HUD released $710,000 for the Glendale Heights Project with the express stipulation that "the county will be expected to address unmet family and large family goals before undertaking any additional elderly/handicapped housing units." As a result of HUD's statement, Glendale Heights modified their proposal to include eight family housing units. Following this modification, the County Board on December 19, 1978, withdrew its approval of the proposed subgrant to Glendale Heights to complete the project. At the December 19 and 27, 1978 Board meetings, the County Board discussed the financial risk to the County and other matters related to the Glendale Heights proposal, including but not limited to: (1) Glendale Heights' lack of financial resources to indemnify the County in the event that Glendale Heights failed to perform since if that were to occur, the County would be liable to HUD for repayment of the grant; (2) the lack of financial and political stability in the Glendale Heights municipal government; (3) the changes in HUD directives that required construction of family housing units rather than units for the elderly as originally proposed; and

(4) the failure to resubmit the amended project to the community in accordance with HUD's citizen participation standards.

Following the County's disapproval, County Board member Ruth Kretchmer appeared at a public meeting held in Glendale Heights regarding the project. At that meeting she stated:

> "[T]he County Board members are going to be very reluctant to approve this proposal unless there is adequate proof that it is something that the residents of Village of Glendale Heights want. Fifty-one percent would not be enough. The County Board would want evidence, through the elected officials of the Village, of overwhelming support for this proposal."

Glendale Heights never resubmitted the project for consideration.

■ 6. The district court also examined the proceedings of the DuPage County Zoning Board and Zoning Committee in an attempt to discern the intent and purpose of the County's land development policy. With respect to those proceedings, the plaintiffs conducted a study of the County's zoning files regarding residential developments with ten or more housing units for the period between June 1963 and April 1976. As found by the district court, the study revealed that:

> "(1) the question of whether the development would generate sufficient taxes to pay for the public services used by its residents, and particularly the cost of education, was discussed in 65% of the zoning files,
>
> (2) the effect which the proposed development might have on the value of nearby property was discussed in 88% of the files, and
>
> (3) no specific reference to racial composition of the residents of the developments was made in any of the files."

While the defendants agreed that the proposed price of housing units, whether for sale or rent, should not be considered in the determination of whether to grant a zoning variance or special use, approximately 84% of the zoning board files examined in the plaintiffs' study contained a statement of unit price.[2]

The district court noted that the plaintiffs additionally contended that certain references made during Zoning Board and Committee meetings to "higher grade people," "high class residents," and "[p]eople that you don't have to worry about having so many services for, people that don't maybe have so many kids," were in reality thinly veiled references to race.

7. Finally, the district court considered the disparity between the number of blacks living in the unincorporated areas. For example, the court stated that in 1970, .336% of the County's population was black, but only .007% of the population in the wholly unincorporated areas of the County was black. In addition it noted that, "while .067% (⅔ of 1%) [sic] of the County's rental units were occupied by blacks no rental units within the wholly unincorporated areas of the County were occupied by blacks." Furthermore, "while .15% (15/100ths of 1%) of owner occupied housing units in the entire County were occupied by blacks, only .02% (2/100ths of 1%) of housing units located in the wholly unincorporated areas of the County were occupied by blacks."

The preceding is a summary of the selected evidence relied upon by the court in reaching its conclusion that the County knowingly and intentionally, through its housing policies and practices, excluded persons of low and moderate income and racial minorities from residing in the County.

## II

■ Before turning to the question of the plaintiffs' standing in the present ac-

---

**2.** We note that under Illinois law, conserving the value of property throughout the county is a legitimate zoning concern, Ill.Rev.Stat. ch. 34, § 3151 (1983), *LaSalle National Bank v. County of Lake,* 27 Ill.App.3d 10, 325 N.E.2d 105, 111 (1975), *Continental Homes, Inc. v. County of Lake,* 37 Ill.App.3d 727, 346 N.E.2d 226, 231 (1976), which might make the sale or rental price of proposed projects relevant.

tion, it is necessary to determine the standard of review to be applied in our consideration of the district court's decision. The defendants argue that the "clearly erroneous" standard of Fed.R.Civ.P. 52(a) does not govern our review because the district court, in effect, tried this case on "cold stipulations" and thus there exists no credibility determinations calling for deference. In support of their position, they cite *Fargo Glass & Paint Co. v. Globe American Corp.*, 201 F.2d 534, 536 (7th Cir.), *cert. denied*, 345 U.S. 942, 73 S.Ct. 833, 97 L.Ed. 1368 (1953) and *Himmel Bros. Co. v. Serrick Corp.*, 122 F.2d 740, 742 (7th Cir.1941). It cannot be denied that large volumes of materials were exchanged by the parties via stipulations, depositions, and written objections; however, the court also presided over three-and-one-half days of testimony of various witnesses. Furthermore, the district judge prepared his own factual findings and opinion in addition to adopting a portion of the plaintiffs' proposed findings numbered 464 through 559.

Our court faced a similar question in *City of Mishawaka, Ind. v. Am. Elec., Etc.*, 616 F.2d 976 (7th Cir.1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981), where the appellants likewise argued that the action was essentially a paper case. As in the present case, there had been a three-and-one-half day bench trial supplemented by lengthy stipulations, exhibits and depositions. Under the circumstances, the court felt that the trial judge was required to make credibility determinations and thus refused "to go behind the findings of the trial judge." *Id.* at 979. We likewise hold that the trial judge in the present case was required to and did make credibility judgments regarding the witnesses and evidence presented. Therefore, we will apply the clearly erroneous standard of Fed.R.Civ.P. 52(a). *See also United States v. City of Birmingham, Mich.*, 727 F.2d 560, 564 (6th Cir. 1984).

As defined by the Supreme Court:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

*United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). This definition was recently reaffirmed in *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982).

Turning now to the issue of standing, the district court concluded:

"Plaintiffs and the plaintiff class have established that they have been and continue to be injured by the actions of the defendants and that their inability to secure housing in DuPage County is fairly traceable to the County's actions. Accordingly, they have standing to challenge those actions."

It is from this finding that the defendants appeal.

According to the Supreme Court in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975):

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise.... In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society."

*Id.* at 498, 95 S.Ct. at 2205 (citations omitted). More recently, the Supreme Court has emphasized the importance of the minimum constitutional requirements of standing to the exercise of federal jurisdiction.

"Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States. Article III, which is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by

the Framers of the Constitution at Philadelphia in 1787, a charter which created a general government, provided for the interaction between that government and the governments of the several States, and was later amended so as to either enhance or limit its authority with respect to both States and individuals."
*Valley Forge Christian College v. Americans United,* 454 U.S. 464, 475–76, 102 S.Ct. 752, 760–761, 70 L.Ed.2d 700 (1982) (footnote omitted).

 As delineated by the Court in *Valley Forge,* the minimum constitutional requirements of standing are as follows: "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision,' *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976)."

454 U.S. at 472, 102 S.Ct. at 758 (footnote omitted). *See also Planned Parenthood Ass'n. of Chicago v. Kempiners,* 700 F.2d 1115, 1131 (7th Cir.1983) (Eschbach, J.). If a plaintiff fails to meet the minimum constitutional requirements for standing, as the preceding quotations establish, the district court must dismiss the action for failure of subject matter jurisdiction. *See, e.g., People Organ. for Welfare & Emp. Rights v. Thompson,* 727 F.2d 167, 169 (7th Cir.1984). Furthermore, standing does not necessarily flow from the validity of the plaintiff's contention on the merits, rather the focus is on the plaintiff and whether he or she has alleged and proven facts necessary to meet the minimum constitutional requirements of standing. *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. at 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *South East Lake View, Etc. v.*

*Dept. of Housing,* 685 F.2d 1027, 1034 (7th Cir.1982).

 With these general principles as background, we now turn to the question of whether the named individual low and moderate income plaintiffs, and HOPE, Inc. have standing in the present action. We treat the question as to standing of the plaintiff class separately from the question of HOPE, Inc.'s standing. The individual plaintiffs were authorized by an order, entered September 21, 1972, to maintain this suit as a class action on behalf of all persons with incomes that would qualify them for publicly assisted housing under either federal or Illinois law. For any of the individual plaintiffs to continue to litigate on behalf of the class, however, at least one of them must establish that he or she met the minimum constitutional requirements for standing. As the Supreme Court originally stated in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974),

"if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."

*Id.* at 494, 94 S.Ct. at 675 (footnote omitted). This proposition was subsequently reaffirmed in *Warth v. Seldin,* 422 U.S. at 502, 95 S.Ct. at 2207 and then again in *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. at 40 n. 20, 96 S.Ct. at 1925 n. 20. Specifically, in *Simon* the court stated:

"The individual respondents sought to maintain this suit as a class action on behalf of all persons similarly situated. *That a suit may be a class action, however, adds nothing to the question of standing,* for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"

*Id.* (emphasis added) (*quoting Warth,* 422 U.S. at 502, 95 S.Ct. at 2207). Thus, for any of the individual plaintiffs to continue to litigate on behalf of the class in the present case, he or she must establish standing in his or her own right.

The defendants throughout the pendency of this action have pressed their contention that the plaintiffs lack standing as they have neither been able to allege nor prove that the County Board has interfered with, impeded or denied any project which ultimately resulted in injury to themselves. In essence, the defendants argue that the plaintiffs have failed to allege and establish: (1) that they have suffered a discrete and palpable injury as a result of the defendants "putatively illegal conduct"; (2) that their asserted injury "fairly can be traced to the challenged action" of the defendants; and (3) that judicial intervention would redress their asserted injury.

To support their contention the defendants have relied to a great extent on the Supreme Court's decision in *Warth v. Seldin.* The similarities of this case and *Warth* are both striking and compelling. As in the present action, *Warth* involved a claim that a zoning ordinance, by its terms and as enforced, effectively excluded persons of low and moderate income from living in the area encompassed by that ordinance. The plaintiffs in *Warth,* like the plaintiffs in the present case, were comprised of both individuals of low and moderate income allegedly excluded from living in the zoned area, and a not-for-profit organization whose stated purpose was to foster action to alleviate the general housing shortage for low and moderate income persons.

The Supreme Court in *Warth* ultimately held that the individual plaintiffs lacked standing to sue because the plaintiffs failed to establish that they had suffered the "demonstrable, particularized injury" necessary to satisfy the constitutional requirements of standing. 422 U.S. at 508, 95 S.Ct. at 2210. As the standing issue was decided on a motion to dismiss, the *Warth* Court was required to accept as true all material allegations of the complaint. *Id.* at 501, 95 S.Ct. at 2206. Thus, the Supreme Court stated:

"We must assume, taking the allegations of the complaint as true, that Penfield's zoning ordinance and the pattern of enforcement by respondent officials have had the purpose and effect of excluding persons of low and moderate income, many of whom are members of racial or ethnic minority groups. We also assume, for purposes here, that such intentional exclusionary practices, if proved in a proper case, would be adjudged violative of the constitutional and statutory rights of the persons excluded."

*Id.* at 502, 95 S.Ct. at 2207. Notwithstanding these assumptions, the Supreme Court denied standing to the plaintiffs in *Warth* because of their failure to adequately allege a concrete and particularized injury to themselves. Thus, at the very outset of its analysis the court delineated the required focus of the plaintiffs' allegations necessary for them to demonstrate standing.

"But the fact that these petitioners share attributes common to persons who may have been excluded from residence in the town is an insufficient predicate for the conclusion that petitioners themselves have been excluded, or that the respondents' assertedly illegal actions have violated their rights. Petitioners must allege and show that *they personally have been injured,* not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy *between themselves personally and respondents,* 'none may seek relief on behalf of himself or any other member of the class.' *O'Shea v. Littleton,* 414 U.S. 488, 494 [94 S.Ct. 669, 675, 38 L.Ed.2d 674] (1974). See, *e.g., Bailey v. Patterson,* 369 U.S. 31, 32–33 [82 S.Ct. 549, 550–551, 7 L.Ed.2d 512] (1962)."

*Id.* at 502, 95 S.Ct. at 2207 (emphasis added).

The *Warth* Court explained, in its application of the "particularized injury" requirement to the facts presented in the challenge to the zoning ordinance, that in order to gain standing, the prospective plaintiffs were required to demonstrate that absent the alleged unconstitutional acts, there was a substantial probability that they would have found adequate low or moderate income housing in the area encompassed by the zoning ordinance:

"We may assume, as petitioners allege, that respondents' actions have contributed, perhaps substantially, to the cost of housing in Penfield. But there remains the question whether petitioners' inability to locate suitable housing in Penfield reasonably can be said to have resulted, in any concretely demonstrable way, from respondents' alleged constitutional and statutory infractions. Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a *substantial probability* that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed. *Linda R.S. v. Richard D.*, 410 U.S. 614 [93 S.Ct. 1146, 35 L.Ed.2d 536] (1973)."

*Id.* at 504, 95 S.Ct. at 2208 (emphasis added).

The Supreme Court's requirement in *Warth* that the individual plaintiffs establish that, absent the town's "restrictive zoning practices," there was a substantial probability they would have been able to find the desired low or moderate income housing, is based in part on its recognition that the availability of low and moderate income housing depends not only on zoning practices, but also "on the efforts and willingness of third parties to build low- and moderate-cost housing," *Id.* at 505, 95 S.Ct. at 2208.

The plaintiffs' failure to demonstrate that they were, in fact, financially able to occupy the subsidized housing (the construction of which was allegedly prevented through the unconstitutional application of the zoning ordinance) ultimately led the *Warth* Court to hold that none of the individual plaintiffs satisfied the basic requirements of establishing a personal and "particularized injury." *Id.* at 506–08, 95 S.Ct. at 2209–10. The Court expressly distinguished its holding from other decisions acknowledging the standing of low income, minority group plaintiffs to challenge exclusionary zoning practices, by noting that in those cases, the plaintiffs' challenges related to *specific housing projects* in which the plaintiffs established that they personally intended to and were, in fact, eligible and financially able to reside.

"In support of their position, petitioners refer to several decisions in the District Courts and Courts of Appeals, acknowledging standing in low-income, minority-group plaintiffs to challenge exclusionary zoning practices. In those cases, however, the plaintiffs challenged zoning restrictions *as applied to particular projects* that would supply housing within their means, and of which they were intended residents. The plaintiffs thus were able to demonstrate that unless relief from assertedly illegal actions was forthcoming, their immediate and personal interests would be harmed. Petitioners here assert no like circumstances. Instead, they rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief."

*Id.* at 507, 95 S.Ct. at 2209 (emphasis added, footnote omitted). Thus, the Court concluded:

"[A] plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm *him*, and that he personally would benefit in a tangible way from the court's intervention."

*Id.* at 508, 95 S.Ct. at 2210 (emphasis original, footnote omitted).

As in *Warth*, the present plaintiffs have not been directly injured by any challenged

activity on the part of the County Board. That is, there is no evidence that the County Board ever specifically discriminated against the individual plaintiffs nor have they ever been denied a variance or permit to construct housing. Instead, the plaintiffs claim that the defendants, through their enforcement of the zoning ordinance and other discriminatory housing practices, deterred developers and builders from constructing housing suitable to their needs at prices which they could afford. As the *Warth* Court pointed out, "[t]he fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing." *Id.* at 504–05, 95 S.Ct. at 2208. The *Warth* Court did state, however, that indirectness of injury "may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id.* at 505, 95 S.Ct. at 2208.

█ Herein lies the heart of the problem with the individual plaintiffs' attempt to establish standing. The individual plaintiffs have failed to either allege or subsequently prove the causal connection between the County Board's activity and their asserted injury. Specifically, there have been no allegations nor proof offered by the individual plaintiffs establishing that a single proposed project for low or moderate income housing was in any way impeded, much less denied, by any discrete and concerted activity on the part of the DuPage County Board. Furthermore, there is a glaring absence of testimony much less evidence in the record to establish that any third parties in fact actually existed who were ready, willing, and able to build low or moderate income housing in the unincorporated portions of the County were it not for the challenged zoning ordinance and the alleged unconstitutional enforcement thereof. it is at best mere conjecture and speculation that any third party would have built low income housing if it were not for fear of some sort of retaliation on the part of the County Board. In addition, we think it is telling of the plaintiffs' argument that during the ten years over which this action has been pending, the plaintiffs have been unable to cite to even one proposed low income housing project that the County Board in turn refused to grant any necessary zoning variance or special-use permit.[3]

Thus, even assuming the plaintiffs could have afforded to live in housing projects that might have been constructed, there has been no showing of *any* activity by the County Board which has either directly or indirectly injured the plaintiffs. Without that showing the individual plaintiffs fail in their quest to establish the threshold requirement of standing because of their inability to allege and/or prove a "demonstrable, particularized injury," *Warth,* 422 U.S. at 508, 95 S.Ct. at 2210, which " 'fairly can be traced to [any] ... challenged action' " of the defendant County Board. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 759 (*quoting Simon,* 426 U.S. at 41, 96 S.Ct. at 1926). As we previously noted, the Supreme Court in *Warth* emphatically required that a plaintiff "who seeks to challenge exclusionary zoning practices *must allege specific, concrete facts demonstrating that the challenged practices harm him* ...." 422 U.S. at 508, 95 S.Ct. at 2210 (emphasis added). Since the individual plaintiffs have failed to produce even a single instance wherein the County Board has denied a zoning variance or a special-use permit for proposed low or moderate income housing, and thus have been unable to allege, much less prove, *any* "challenged activity" of the Board which *caused* their alleged injury, they fall short in their at-

---

**3.** The plaintiffs have not attempted to establish the particularized injury requisite for standing based specifically on the county's activities with regard to the proposed project in Glendale Heights. Even if they had, such arguments would be unpersuasive as they neither alleged nor established through the evidence that the individual plaintiffs had intended to live in the project or that there was a substantial probability that if constructed they would have been able to obtain housing there. Thus, again no causation is established between the defendants' actions and the plaintiffs' injuries.

tempt to establish standing under the guidelines enunciated by the Supreme Court in *Warth*.

The plaintiffs' allegation of conspiracy in their original complaint does not improve their position as to standing since the district court specifically stated in its findings of fact that it did not find a conspiracy between the County and the developer defendants. While the elements of standing must initially be sufficiently alleged in the pleadings, they must also be established through the introduction of evidence in order to obtain any judicial relief. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n. 31, 99 S.Ct. 1601, 1616 n. 31, 60 L.Ed.2d 66 (1979); *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 72–78, 98 S.Ct. 2620, 2629–2633, 57 L.Ed.2d 594 (1978); *N.A.A.C.P., Boston Chapter v. Harris*, 607 F.2d 514, 526 (1st Cir.1979); *City of Hartford v. Towns of Glastonbury*, 561 F.2d 1032, 1051 (2d Cir.1977) (en banc), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 766, 54 L.Ed.2d 781 (1978); *Legal Aid Soc. of Alameda Cty. v. Brennan*, 608 F.2d 1319, 1333 n. 26 (9th Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *Black Faculty Ass'n v. San Diego Community College*, 664 F.2d 1153, 1155 (9th Cir.1981); *City and County of Denver v. Matsch*, 635 F.2d 804, 807–08 (10th Cir.) (memorandum order granting petition for writ of prohibition), *petition to vacate denied*, 449 U.S. 1058, 101 S.Ct. 779, 66 L.Ed.2d 601 (1980); *Glover River Organization v. U.S. Dept. of Interior*, 675 F.2d 251, 254 n. 3 (10th Cir.1982). The plaintiffs' inability to substantiate the existence of the alleged conspiracy prevents them from relying on those allegations to establish standing to obtain judicial relief.

Even if the conspiracy allegations could be used in an attempt to meet the "fairly can be traced to the challenged action" element of minimum constitutional standing, we would hold that standing was not thereby established. The conspiracy allegations were not supported by one allegation of specific and concrete fact to substantiate its existence. We refuse to countenance or play a part in subverting the dictates of *Warth* by allowing the plaintiffs to establish standing by simply including in their complaint a bald and unsubstantiated assertion of conspiracy which finds no basis in concrete fact; to do so would be to undermine the *Warth* requirement of allegations of "specific, concrete facts demonstrating that the challenged practices harm *him* ...." *Warth*, 422 U.S. at 508, 95 S.Ct. at 2210 (emphasis original).

*Warth* provided that a court could, if faced with an unsubstantiated complaint, require the plaintiff to supply it with "further particularized allegations of fact deemed supportive of plaintiff's standing." *Id.* at 501, 95 S.Ct. at 2206. Here, the case went to judgment without the plaintiffs being able to provide the district court with sufficient evidence to support a finding of conspiracy between the County and the builder-developers. Evidence, for example, that demonstrated that developers who operate in DuPage County build subsidized housing in other counties, or which established a covert relationship between the Board and the developers was never presented, indicating that the conspiracy allegation was effectively boiler plate. As the *Warth* Court stated, "[i]f, after this opportunity [to provide additional materials], the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." *Id.* at 501–02, 95 S.Ct. at 2206–07. After reviewing the allegations of conspiracy in light of the evidence we hold that they do not support the causation or "fairly can be traced" element of standing.

The plaintiffs contend, however, that the defendants, through their public statements and actions, in effect sent direct messages to all builders indicating that if they wanted to continue constructing projects in DuPage County they would be well advised not to propose low or moderate income housing. With regard to this assertion, the district court specifically stated in its analysis dealing with ripeness that:

"The facts, as we have found them, are that developers, because they are aware of the County's housing policies, do not apply for zoning variations or special use exceptions to build projects in which plaintiffs and the class members could reside either as tenants or owners. While we have not found a conspiracy between the County and the developer defendants, we have found that developers simply do not attempt to build integrated low and moderate income projects in DuPage County."

If by this statement and its ultimate holding, the district court was inferentially finding that the causal connection between the plaintiffs' injury and the defendants' conduct was established by the fact that developers knew of the County Board's intentions and acted accordingly, then we hold that finding to be clearly erroneous since, after a thorough review of the evidence, we are unable to discover support for such a finding in the record.

To substantiate this inference, the plaintiffs point to evidence allegedly demonstrating the County Board's animosity towards low and moderate income housing. Upon review of the record, however, we have been unable to discern any evidence that the developers who build in DuPage County were in any way affected by this alleged animosity. Not one developer testified that he or she was thwarted or deterred from building subsidized housing by the County Board's alleged discriminatory policies. Furthermore, the plaintiffs failed to offer any evidence that developers who operate in DuPage County have built, or intended at that time to build low-income housing in any other county. The introduction of such evidence might at least raise an inference that there must be some reason why developers do not build low income housing in DuPage County but engage in such construction in other counties. The total lack of evidence linking DuPage County's alleged animosity towards low income and moderate income housing to the failure of developers to propose and build low income projects leaves this court, in the words of the Supreme Court, with a "definite and firm conviction" that the district court was mistaken in concluding that such a connection existed. *United States v. United States Gypsum Co.*, 333 U.S. at 395, 68 S.Ct. at 542. We simply are unwilling to engage in the speculation necessary to reach the plaintiffs' asserted connection between the County's alleged animosity and the developers reluctance to build low cost housing, and therefore hold that the evidence in the record fails to substantiate the district court's finding in this regard. Note that contrary to the court's finding that developers do not apply for zoning variations and special use permits because of their awareness of the County's allegedly discriminatory housing attitudes, the record does contain evidence in the stipulated materials that justifies the alternative explanation, that construction of low and moderate cost housing is not and has not been profitable or economically feasible in DuPage County.[4] Stip. of Evid. Vol. VII ¶ ¶ 1514–21, 1668–71.

---

**4.** To support the inference that developers do not propose subsidized housing due to the County's animosity toward such projects the plaintiffs in their brief on petition for rehearing refer to the fact that "[c]ompared to housing in the incorporated areas (where the County has no zoning authority), housing in the oddly shaped pieces that make up the unincorporated areas is substantially more expensive and houses far fewer blacks.... The only reasonable explanation for these facts is the County's discriminatory zoning practices." We do not agree. Subsidized housing requires services such as public transportation, convenient shopping availability, convenient school opportunities, etc. that are not found in more rural areas. Thus it is natural and rational that lower cost subsidized housing occurs with greater frequency in incorporated areas. This alone could logically explain the comparative higher cost of housing and lower number of blacks in the unincorporated areas.

In our analysis of the dissent, we note that they argue that the primary premise of the majority was that it was not economically feasible for developers to build low and moderate income housing in DuPage County. Dissent at 820. We do not understand the dissent's reasoning in this regard as we did not make this finding of fact but merely suggested an alternative logical explanation, finding support in the record and suggested at oral argument, for lack of low and moderate income housing in DuPage County, since, as we previously pointed out, the

In an attempt to overcome the problem presented by their inability to allege even one project which was in any way thwarted by the County's zoning practices, the plaintiffs cite to a footnote in the *Warth* opinion which provides:

"This is not to say that the plaintiff who challenges a zoning ordinance or zoning practices must have a present contractual interest in a particular project. A particularized personal interest may be shown in various ways, which we need not undertake to identify in the abstract. But usually the initial focus should be on a particular project. See, *e.g.*, cases cited in n. 17, *supra*. We also note that zoning laws and their provisions, long considered essential to effective urban planning, are particularly within the province of state and local legislative authorities. They are, of course, subject to judicial review in a proper case. But citizens dissatisfied with provisions of such laws need not overlook the availability of the normal democratic process."

422 U.S. at 508 n. 18, 95 S.Ct. at 2210 n. 18. With respect to this footnote, the plaintiffs assert that "[t]he conduct of the defendants made it impossible for the plaintiffs in this case to make an initial focus on a particular project. They have, however, demonstrated 'a particularized personal interest' and they do have standing."

The plaintiffs fail to recognize that the preceding footnote does not qualify the *Warth* Court's basic requirement that to establish standing, potential litigants must demonstrate that "the challenged practices harm" them. In this case the plaintiffs have not established through allegation or proof the necessary causal connection be-

tween the defendants' alleged wrongdoing and the plaintiffs' alleged injury. Specifically, the evidence of record falls far short of demonstrating that the defendants' alleged unconstitutional conduct completely intimidated developers from proposing low or moderate income housing projects. Instead, as we noted previously, there is evidence in the record to support the inference that such housing was not constructed due to the economic conditions of DuPage County. Absent a showing of causal connection between the County's allegedly intimidating actions and the developers' decision not to construct low and moderate income housing, the plaintiffs must allege and establish that particular projects which met their needs were thwarted due to the defendants' actions and that there was a substantial probability that they would be able to obtain housing in those projects. As the footnote at issue indicates, "usually the initial focus should be on a particular project." The facts in the present case do not warrant an exception to this usual rule.[5] Note that the Supreme Court has reaffirmed its position that the normal focus should be on a particular project. *See Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 264, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977).

We also hold that the plaintiffs failed to establish the third constitutional requirement of standing, i.e., that their injury be redressable through judicial intervention. Absent evidence establishing that any third party developers were intimidated and were therefore reluctant to propose low and moderate income housing it is speculative at best whether enjoining the enforcement of the zoning ordinance, or requiring the County to engage in abstract

---

plaintiffs failed to demonstrate the existence of their explanation that developers were in any manner, shape, or form intimidated, cajoled, or rebuffed from even proposing such housing because of the County officials' alleged animosity. A reading of our majority opinion reveals that the decision is based on the plaintiff's inability to legally or logically trace their injury to the defendants' challenged activity and their ability to demonstrate that judicial intervention will redress their putative injury.

5. Contrary to the dissent's statement that "the majority transforms the *Warth* holding into an absolute requirement that the focus of a suit must be on a particular project," we recognize that the focus on a particular project is merely the *usual* and accepted rule. The facts in the present case do not warrant deviation from this usual focus approved by the United States Supreme Court.

planning will in any way redress the plaintiffs' injuries. The plaintiffs have been unable to cite to any particular project that will now go forward as a result of the trial court's injunction barring the County from enforcing its zoning ordinance. In their brief, the plaintiffs concede that they are not challenging the zoning ordinance per se but rather challenge "the defendants' use of the ordinance as a vehicle by which to practice their discrimination." It seems ironic, if such was their attack, that they completely failed to produce evidence establishing the unlawful use of that ordinance to block any proposed low or moderate income housing project that would have fulfilled their needs. The failure to establish any causal connection between allegedly illegal conduct on the defendants' part and the plaintiffs' injury leads this court to conclude that judicial intervention will not redress their injuries and thus standing also fails for this additional reason.

It is appropriate to note with regard to both the causal connection issue and the redressability issue that the Supreme Court has emphatically stated that "unadorned speculation will not suffice to invoke the federal judicial power." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. at 44, 96 S.Ct. at 1927. *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Myron v. Chicoine*, 678 F.2d 727, 730 (7th Cir.1982); *International Union, Etc. v. Johnson*, 674 F.2d 1195, 1199 (7th Cir.1982). In *Simon*, the plaintiff sued the Secretary of the Treasury and the Commissioner of Internal Revenue claiming that the IRS's policy of extending favorable tax treatment to nonprofit hospitals that did not serve indigents to the extent of the hospital's "financial ability," encouraged hospitals to deny services to indigents. Each individual plaintiff alleged an occasion on which he/she or a member of his/her family had been disadvantaged in seeking needed medical hospital care because of indigency. The court found, however, that it was "purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' [defendants'] 'encouragement'

or instead result from decisions made by the hospitals without regard to the tax implications," i.e., based solely on economic factors. 426 U.S. at 42–43, 96 S.Ct. at 1926. Similarly here, as was also the case in *Warth*, the failure to construct low or moderate income housing could just as easily be a consequence of the area housing market as of the County's assertedly illegal acts, and in fact, the defendants submitted evidence to that effect in the stipulations. In *Warth*, the court concluded that the plaintiffs relied "on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief." 422 U.S. at 507, 95 S.Ct. at 2209. The same can be said in the present case. The individual plaintiffs have alleged and proved nothing more than a remote possibility that their situation might have been better had the County Board acted otherwise and might improve were the court to afford relief. As previously noted, such speculative "possibilities" cannot form the basis for a finding of standing. The plaintiffs' allegations and proof simply do not demonstrate that their alleged injuries " 'fairly can be traced to the [County's] challenged action' " nor that such injuries are " 'likely to be redressed by a favorable decision,' " both of which are necessary to establish standing. *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758 (*quoting Simon*, 426 U.S. at 38, 41, 96 S.Ct. at 1924, 1925).

Indeed it can be persuasively argued that the plaintiffs in *Warth* had a much stronger case for standing than the individual plaintiffs in the present case. In *Warth*, the plaintiffs alleged that Penfield's zoning and planning boards committed specific acts in violation of their rights.

"Petitioners also alleged that 'in furtherance of a policy of exclusionary zoning,' ... the defendant members of Penfield's Town, Zoning, and Planning Boards had acted in an arbitrary and discriminatory manner: they had delayed action on proposals for low- and moderate-cost hous-

ing for inordinate periods of time; denied such proposals for arbitrary and insubstantial reasons; refused to grant necessary variances and permits, or to allow tax abatements; failed to provide necessary support services for low- and moderate-cost housing projects, and had amended the ordinance to make approval of such projects virtually impossible." 422 U.S. at 495–96, 95 S.Ct. at 2203 (citation omitted). In addition, the plaintiffs in *Warth* were able to allege that the Penfield Planning Board had denied two efforts by developers to construct subsidized housing. *See Id.* at 505, 95 S.Ct. at 2208. These specific allegations of wrongdoing, when compared to the unsubstantiated assertions of the individual plaintiffs in the present case, demonstrate that, in many respects, the plaintiffs in *Warth* alleged a far stronger case for standing than the individual plaintiffs in the action at bar. However, as previously noted, notwithstanding the comparative strength of the plaintiffs' allegations in *Warth*, the Supreme Court denied standing premised on its finding that the plaintiffs had failed to establish a causal connection between their injury and the asserted wrongful acts of the planning board and also failed to establish that their injuries would likely be redressed by judicial intervention. Thus, if standing was properly denied by the Supreme Court in *Warth, a fortiori,* it must be denied in the present case.

To support its finding that the individual plaintiffs had standing, the district court also relied on the Supreme Court's decision in *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Specifically, the district court stated:

"We dealt with the question of plaintiffs' standing in our opinion of February 4, 1976. *Planning for People Coalition v. DuPage County*, 70 F.R.D. 38 (N.D.Ill. 1976). We there held that plaintiffs did have standing and that the Court had jurisdiction. Subsequent to that holding, the Supreme Court, in *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra*, upheld the standing of persons like plaintiffs and the members of the plaintiff class who 'would probably move' into housing in DuPage County if it were available to them. In *Arlington Heights*, only one project or development was involved. In the instant case, the possibility of development in all of the unincorporated areas of the County is involved."

The district court's reliance on *Arlington Heights* is misplaced for the very reason that it failed to recognize that the key to the *Arlington Heights* decision was the fact that the plaintiffs therein were able to point to a specific project which had been thwarted by the actions of the defendant municipality. *Arlington Heights* involved the denial of a rezoning petition for a project to build low and moderate income housing, and all of the plaintiffs' allegations and proof related to that project. In its discussion of standing concerning one of the individual plaintiffs, the court stated:

"The injury Ransom asserts is that his quest for housing nearer his employment has been thwarted by official action that is racially discriminatory. If a court grants the relief he seeks, there is at least a 'substantial probability,' *Warth v. Seldin, supra*, [422 U.S.] at 504 [95 S.Ct. at 2208], that the Lincoln Green project will materialize, affording Ransom the housing opportunity he desires in Arlington Heights. His is not a generalized grievance. *Instead, as we suggested in Warth, supra*, at 507, 508, n. 18 [95 S.Ct. at 2209, 2210, n. 18], *it focuses on a particular project and it is not dependent on speculation about the possible actions of third parties not before the court.* See *Id.* at 505 [95 S.Ct. at 2208]; *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S., at 41–42, [96 S.Ct. at 1925, 1926]. *Unlike the individual plaintiffs in Warth, Ransom has adequately averred an 'actionable causal relationship' between Arlington Heights' zoning practices and his asserted injury. Warth v. Seldin, supra*, at 507 [95 S.Ct. at 2209]."

429 U.S. at 264, 97 S.Ct. at 563 (emphasis added). Note that the Supreme Court directly referred to the individual plaintiff's ability to focus on a specific project that had been denied a zoning variance necessary to allow it to proceed. Additionally, the individual plaintiff alleged that he would probably move there if the proposed project was built. The court's emphasis on the importance of focusing on a particular project is even more evident in its discussion concerning the non-profit developer's standing; there the court stated: "[w]hen a project is as detailed and specific as Lincoln Green, a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy." *Id.* at 261–62, 97 S.Ct. at 561. Thus, the facts in *Arlington Heights* are clearly distinguishable from the present case since there have been no concrete allegations or proof that any proposed housing project, into which the plaintiffs intended to and would probably move, was in fact denied special use permits or zoning variances.

As previously mentioned, this very distinction was recognized by the Supreme Court in *Warth* where the Court specifically distinguished its decision from prior cases that had acknowledged standing or low and moderate income plaintiffs to challenge exclusionary zoning practices. As in *Arlington Heights*, the distinguished cases involved challenges to zoning restrictions as applied to *specific projects*. In addition, the plaintiffs in those cases established that unless relief was granted, their "immediate and personal interests would be harmed." *Warth*, 422 U.S. at 507, 95 S.Ct. at 2209. The *Warth* Court concluded that the cited cases *were not controlling* as the petitioners were only able to assert a "remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief." *Id.* at 507, 95 S.Ct. at 2209. There is no language in the *Arlington Heights* opinion that justifies any deviation from the Supreme Court's clear and unequivocal holding in *Warth*, that a plaintiff must demonstrate a "particularized injury," which reasonably can be said to have resulted from the defendant's allegedly wrongful conduct, before he can establish standing. Therefore, the district court's reliance on the *Arlington Heights* opinion is misplaced for the very reason that the plaintiffs, as in *Warth*, have not and cannot allege (1) that any particular project was thwarted by any wrongful conduct of the defendants such as the denial of a zoning variance of a special use permit, and (2) that they themselves would specifically benefit from the grant of the relief sought. Absent such allegations and proof we hold standing has not been established.

We next turn to the issue of the plaintiff HOPE's standing. HOPE claims standing both as an organization asserting its own legal rights and as a representative of certain third parties. The district court found that HOPE had standing in its representational capacity since a number of its directors were low or moderate income persons actively seeking adequate housing in DuPage County. *Planning for People Coalition v. DuPage Cty., Ill.*, 70 F.R.D. at 47. As our court stated in *International Union, Etc. v. Johnson*, 674 F.2d at 1200:

"Even in the absence of injury to itself, an association may enjoy standing to sue on behalf of its members if (1) the conduct challenged is injurious to its members, (2) the claim asserted is germane to the association's purposes, and (3) the cause can proceed without the participation of the individual members affected by the challenged conduct. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

'The association must allege that its members, or any of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. [...] So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual

participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.'

*Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) (citation omitted)."

The problem with HOPE's standing in its representational capacity is that it has not alleged much less proven that any of its members or directors either suffered an injury or was threatened with immediate injury to the extent that the member or director would be able to make out a justiciable case had he brought suit himself (the same problem facing the individual plaintiffs). Since HOPE has not demonstrated that any party that it represents as a "member" has standing, it cannot have standing as that member's representative.

■ *Amicus curiae* attempts to expand HOPE's representational capacity, however, by extending it beyond HOPE's members and directors to all persons for whom HOPE seeks housing. This argument ignores the fact that standing in representational capacity requires that the representative litigate on behalf of *members* who would have standing in their own right, and furthermore, that the group of low and moderate income persons, for which HOPE seeks housing in DuPage County, are not and cannot be considered *members* of HOPE. The Supreme Court has *not* seen fit to extend representational capacity standing to entities other than associations which actually represent interests of parties whose affiliation with the representational litigant is that of membership with the representative or substantial equivalent of membership. We likewise decline to further extend representational standing.

*Amicus* cites to *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) to support its novel argument; however, its reliance on *Hunt* for extending the reach of representational standing to those individuals who do not have the character-

istics of a member of the representative organization is misguided. In *Hunt,* the Court was faced with a state agency, the Washington State Apple Advertising Commission, which was attempting to litigate on behalf of Washington apple growers. According to the Court, the issue was whether the Advertising Commission's status as a state agency "rather than a traditional voluntary membership organization, preclude[d] it from asserting the claims of the Washington apple growers and dealers who form[ed] its constituency." *Id.* at 344, 97 S.Ct. at 2442. The Supreme Court looked to the fact that the Advertising Commission's constituency was effectively the equivalent of "members" to justify its holding that the Commission had standing as the growers' representative.

"The Commission, while admittedly a state agency, for all practical purposes performs the functions of a traditional trade association representing the Washington apple industry. As previously noted, its purpose is the protection and promotion of the Washington apple industry; and, in the pursuit of that end, it has engaged in advertising, market research and analysis, public education campaigns, and scientific research. It thus serves a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation.

Moreover, while the apple growers and dealers are not 'members' of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the cost of this lawsuit, through assessments levied upon them. In a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests. Nor do we find it significant in determining whether the Commission may proper-

ly represent its constituency that 'membership' is 'compelled' in the form of mandatory assessments. Membership in a union, or its equivalent, is often required. Likewise, membership in a bar association, which may also be an agency of the State, is often a prerequisite to the practice of law. Yet in neither instance would it be reasonable to suggest that such an organization lacks standing to assert the claims of its constituents." *Id.* at 344–45, 97 S.Ct. at 2442. Clearly, the Apple Commission in *Hunt* was an organization which represented the growers who were for all practical purposes "members" of that commission. The same cannot be said for those low and moderate income individuals whom HOPE purports to represent. Since they cannot even be said to be the substantial equivalent of members of HOPE, HOPE has no standing in a representational capacity to represent them as if they were.[6] *See also People Organ. for Welfare & Emp. Rights v. Thompson*, 727 F.2d at 173.

▆ Finally, HOPE argues that it has standing in its own right based on an alleged injury to its corporate purpose of finding housing for low and moderate income persons in DuPage County. Its allegations in this regard, however, are of no greater merit than those of the individual plaintiffs since HOPE also has failed to show a causal connection between its alleged injury and any challenged activity on the part of the DuPage County Board. Likewise, for the same reason that the individual plaintiffs have been unable to demonstrate that their injuries can be redressed by judicial intervention, HOPE has failed to establish that enjoining the County from enforcing its zoning ordinance will

in any way improve its ability to perform its corporate purpose. In other words, HOPE also cannot show that its inability to locate low and moderate income housing is in "any concretely demonstrable way," *Warth*, 422 U.S. at 504, 95 S.Ct. at 2208, the result of activity on the part of the DuPage County Board. Under the *Warth* mandate, HOPE has therefore failed to establish standing in its own right.

In an attempt to justify its position that it has standing in its own right, HOPE cites to the Supreme Court's recent decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). That decision, however, is distinguishable for the same reason that *Arlington Heights* is distinguishable from the case at bar. In *Havens*, the defendants allegedly engaged in "racial steering" in violation of § 804 of the Fair Housing Act of 1968, 42 U.S.C. § 3604.[7] The complaint alleged specific instances in which the defendant, Havens Realty Corp., through its agents, told black apartment hunters that it had no apartments available in a particular complex while indicating to white apartment hunters that it did have apartments available. *See Havens*, 455 U.S. at 368, 102 S.Ct. at 1118. Thus, *Havens* involved *specific and particular discriminatory activity* in violation of the plaintiffs' rights. It is apparent that HOPE's reliance on *Havens* is misplaced since the very problem with the plaintiffs' allegations and proof in the present case (both the individual plaintiffs and HOPE) is that they fail to allege specific and particular discriminatory acts such as denial of zoning variations and special-use permits for low and moderate income housing projects. Again, the inabil-

---

**6.** Note that if *Amicus* were correct in its analysis that HOPE could litigate on behalf of individuals that were neither its members nor the substantial equivalent of members, a conflict would be created with the prudential limitation that generally a plaintiff "cannot rest his claim to relief on the legal rights and interests of third parties." *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205.

**7.** Racial steering, as defined by the plaintiffs in *Havens*, is a:

"practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups." 455 U.S. at 366 n. 1, 102 S.Ct. at 1118 n. 1.

ity to show that any developer was deterred by actions of the County Board from proposing low and moderate income housing prevents HOPE from having standing in its own right since it cannot show (1) that the alleged injury to its organizational purpose was fairly traceable to any challenged activity of the County Board, and (2) that judicial intervention will redress that injury.[8]

Based on the preceding analysis we are left with a "definite and firm conviction," *United States v. Gypsum Co.*, 333 U.S. at 395, 68 S.Ct. at 542, that the trial court erred in its finding that the plaintiffs' had standing in the present action and thus hold that its finding in this regard is clearly erroneous under Fed.R.Civ.P. 52(a). Be-

cause of the plaintiffs' failure to meet the minimum constitutional requirements for standing, as set forth by the United States Supreme Court in *Warth v. Seldin*, the remaining issues raised by the defendants need not be reached, and the judgment of the district court is REVERSED.[9]

FLAUM, Circuit Judge, concurring.

The Supreme Court in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), clearly held that plaintiffs must show a particularized injury in order to have standing to challenge zoning practices. Although "[a] particularized personal interest may be shown in various ways, ... usually the initial focus should be on a particular project." [1] *Id.* at 508 n. 18, 95

---

**8.** In its discussion regarding the textual analysis distinguishing *Havens* from the present case, the dissent states:

"[T]he majority undertakes this distinction only by pointing out that HOME [the corporate plaintiff in *Havens*] had alleged specific instances of racial steering, while HOPE was unable to allege a denial of a specific zoning permit. The ability to allege or prove specific instances of discrimination, however, goes only to the plaintiffs' ability to establish the merits of their case and not to a determination whether they have standing to bring the action. Nor is denial of a zoning permit by any means the only possible evidence of discrimination."

This mischaracterization of our analysis distinguishing *Havens* appears to have resulted from the dissent's failure to recognize that in addition to particularized injury, a plaintiff must also demonstrate that his injuries "fairly can be traced" to the defendant's challenged actions and that such injuries are "likely to be redressed by a favorable decision," in order to establish standing under the Constitution. *See Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758.

*Havens* did not alter the requirements of standing. In fact, the Supreme Court explicitly acknowledged the "fairly traceable" or causation element of standing. *Havens*, 455 U.S. at 376, 102 S.Ct. at 1122. The dissent fails to recognize that in *Havens*, causation was not an issue since the plaintiff HOME's injury to its corporate purpose was obviously the result of Havens Realty's pervasive racial steering practice. This trail of causation is clearly not found in the present case thereby making *Havens* inapposite. The essence of HOPE's problem in establishing standing is that it did not and *cannot* demonstrate that any action or statement on the part of the defendants *caused* its injuries, the

same problem also facing the individual plaintiffs.

**9.** While we have decided not to reach the merits of the discrimination claim as we find no standing, we have grave doubts as to whether the plaintiffs sufficiently established the necessary intentional and invidious discriminatory purpose on the County Board's part necessary in order to meet their burden under the Supreme Court's *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) decisions. As our previous review of the facts relied upon by the district court clearly indicates, the evidence purported to establish intentional invidious discrimination is far from compelling.

**1.** *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), does not alter the *Warth* requirement of a particular project. In *Havens*, the plaintiffs alleged that on a number of specific occasions a realty had engaged in racial steering within two existing apartment complexes, in violation of § 804 of the Fair Housing Act of 1968. The Court found that the individual plaintiffs and the plaintiff organization, which conducted a housing referral service, had standing to sue because they alleged that as a result of the actions of racial steering they suffered a palpable injury. *See id.* at 372, 374, 379, 102 S.Ct. at 1120, 1122, 1124. In *Warth*, the plaintiffs alleged that the zoning laws of the town of Penfield were discriminatory. The Court found that the plaintiffs lacked standing because, without a specific project that was allegedly thwarted by the zoning laws, they could not show a particularized injury. *See Warth v. Seldin*, 422 U.S. at 516, 95 S.Ct. at 2214. Thus, both cases require allegation of a specific instance of the alleged wrong-doing in order to

S.Ct. at 2210 n. 18. I share the dissent's view that the usual requirement of a particular project is not necessary where exclusionary policies are so successful that they chill the interest of commercial developers who otherwise would propose and build specific low-income housing projects. The district court in the present case identified such a factual setting when it found that "because [developers] are aware of the County's housing policies ... [they] simply do not attempt to build integrated low and middle income projects in DuPage County." District Court Opinion dated October 1, 1981, at 94. However, based on the record presented to this court, I am unable to conclude that this finding is supported by sufficient evidence. I thus agree with the majority's conclusion that this finding cannot be sustained under the clearly erroneous standard and that therefore this suit must be dismissed for lack of standing.

The most significant facts upon which the district court based its findings are set forth in the majority opinion. *See ante* at 800–802. These facts do not indicate that the DuPage County Board ("Board") actually foreclosed developers from pursuing or proposing a specific housing project. The plaintiffs argue that the widely known policies of the Board prevented developers from presenting projects that they knew would meet with defeat. Yet, the plaintiffs chose to offer no testimony on this point. At oral argument before the *en banc* court, the plaintiffs' counsel explained that the absence of testimony was a result of the Board's intimidation—no developer would want to testify against the policies of the Board for fear of incurring the displeasure of the Board and thus losing all opportunity to work in DuPage County.

In the absence of any affidavits or appropriate representations by the plaintiffs that developers were asked to testify but refused for fear of pecuniary retaliation by the Board, I cannot find the explanation of the plaintiffs' counsel to be any more than speculation. This conjecture, no matter how sincerely offered, is an insufficient

ground upon which to affirm the key finding of the district court that developers do not attempt to build low-income housing projects because they are aware of the county's housing policies. Since this finding cannot be supported by the record created below, and since we have no particular project on which to focus in this case, *Warth* compels me to agree with the majority that the plaintiffs lack standing. In light of this conclusion, I deem it inappropriate to express any opinion on the merits of this suit. I therefore must respectfully disassociate myself from the unnecessary view of the merits expressed in footnote 9 of the majority opinion.

CUDAHY, Circuit Judge, dissenting.

The district court made extensive findings of fact based on the parties' eight volumes of evidentiary stipulations and additional testimonial evidence. This evidence demonstrates that DuPage County, located in the midst of one of the nation's most diverse population centers, remains by design rather than by accident a sanctuary for the white and the affluent. The majority, however, has brushed aside the entire factual basis of this lawsuit. It has ignored the findings of the district court that policies of economic and racial discrimination in housing and practices of exclusionary zoning have fenced the poor and the non-white out of DuPage County. In fact, these policies and practices seem to have been so notorious that apparently no real estate developer has challenged them in unincorporated DuPage. The majority has eagerly seized upon this fact as the basis of its overly strict construction of the standing requirement to deny the plaintiffs access to the courts.

In addition, the majority opinion ignores the analysis of standing provided by the recent Supreme Court decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). *Havens Realty* explicitly holds that an organization has standing to sue in its own right when the organization's purposes and

find a personal injury that is sufficient to establish standing.

activities are frustrated by the defendants' allegedly discriminatory practices. The majority's interpretation of standing, on the other hand, serves to reward and protect those who are so successful in pursuing discriminatory and exclusionary policies as to chill the interest of commercial developers while presumably leaving vulnerable those whose success is less dramatic. As a result, the poor and the non-white are fenced not only out of DuPage County but also out of the federal courts.

## I

The majority has summarily rejected, without conducting a sufficient review of the evidence, the district court's findings, which firmly support standing here. The district court found that the defendants' conduct and statements were the cause in fact of personal and specific injury to the plaintiffs. Judge Will based his conclusion that the plaintiffs had established the requisite case or controversy on his finding that

> the evidence, direct and circumstantial, establishes that DuPage County and its responsible officials have knowingly engaged in a housing policy which is intended to and effectively has excluded plaintiffs and members of the plaintiff

class from becoming residents of the County so that the County continues to have one of the highest per capita incomes in the United States and, at the same time, remains almost entirely white.

HOPE, Inc. v. The County of DuPage, No. 71 C 587, slip op. at 92–93 (N.D. Ill. Oct. 1, 1981) ["HOPE"]. This court is not confronted with the need to *assume* the truth of the plaintiffs' factual allegations in order to determine whether the plaintiffs have standing.[1] Rather, the plaintiffs have successfully *proven* in district court the facts on which their right to standing is based.[2] A mere glance at the suggestive socio-economic context of this case casts the greatest doubt upon the premises underlying the majority's analysis. A cursory look at the unfolding demographic data substantiates the existence and effect of the discriminatory practices and policies which were identified by the district court.[3]

Between 1950 and 1970, the population of DuPage County grew from 150,052 to 485,181, and in 1970 there were 1,276 black persons residing in DuPage County households, representing an almost invisible 0.26% of the total household population of

1. In many cases involving standing issues, the district court had dismissed the suit for lack of standing and the plaintiffs never had the opportunity to establish the truth of their allegations. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

2. Under Rule 52(a), Fed.R.Civ.P., a finding of fact by a district court cannot be set aside on appeal unless that finding is clearly erroneous. As the Supreme Court has noted, this rule

> recognizes and rests upon the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence. Because of the deference due the trial judge, unless an appellate court is left with the "definite and firm conviction that a mistake has been committed," it must accept the trial court's findings.

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)) (citations and footnote omitted). *See also Pullman-Stan-*

dard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). This same standard applies, at least in this circuit, when the district court's findings are based largely, but not exclusively, on stipulations of evidence, as was the case here. *City of Mishawaka, Indiana v. American Electric Power Co.,* 616 F.2d 976, 979–80 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981).

3. Statistical demonstrations have an important role in the proof of various kinds of discrimination, including discrimination in employment and jury selection. "Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339–40 n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396 (1977). The statistics of DuPage County are also probative of the policies and practices of the County and support the inferences drawn by the district court. The majority, in contrast, has failed to address, let alone refute in any way, the logical inferences suggested by these data.

the County. *HOPE*, slip op. at 24–25.[4] A 1973 DuPage County Regional Planning Commission report noted that the County's miniscule percentage of blacks was "surprising" because of its close proximity to Chicago with its large black population. DuPage County, among the other rapidly growing counties of the Chicago metropolitan area, was uniquely the recipient of white persons migrating from Chicago. In fact, the Commission report indicated that between 1960 and 1970 migration accounted for 70.9% of the total population increase in DuPage County and that "[t]he County is in a prime location for receiving migrations from Chicago." *HOPE*, slip op. at 26.

At the same time, DuPage is, measured by per capita income, the fourth richest county in the United States. In 1970 of all the counties in the United States, DuPage had the lowest percentage of its population living at or below the poverty level, and it had the lowest percentage of inexpensive housing, both owner-occupied and rental, of any county in the eight-county Chicago metropolitan area. Between 1964 and 1970, jobs in the County exploded from 56,973 to 108,819. *HOPE*, slip op. at 27. However, 30.2% of those working in DuPage in 1970 lived outside the County, the highest proportion of any of the six Illinois counties in the Chicago metropolitan area. In 1970 a substantial number of Chicago residents commuted daily to DuPage County to work. Five times as many blacks worked in DuPage County as lived there. *HOPE*, slip op. at 29.[5]

In 1942, the DuPage County Board created the DuPage County Housing Authority, the primary purpose of which was to encourage adequate housing for low-income occupants. Since 1942, the Housing Authority has not constructed any multiple-family housing projects in DuPage County. Had it done so, such projects would, of course, have been available to applicants of all races who met the maximum income qualifications. The district court found that the Housing Authority "enjoys the distinction of having done less for fewer people over a longer period of time than any other such authority." *HOPE*, slip op. at 69.

The primary premise of the majority opinion is that "low-and moderate-cost housing is not and has not been profitable or economically feasible in [unincorporated] DuPage County," slip op., *supra*, at 23, and that "the economics of the area housing market" are to blame for the lack of low-cost housing. Petition for Rehearing at 7. The majority thus indulges in its own entirely unwarranted fact-finding, in clear contradiction to the district court's findings, without any support or explanation beyond the citation of unspecified "evidence in the stipulated materials." Slip op., *supra*, at 23.

In fact, the evidence demonstrates that unincorporated DuPage County offers a potentially broad and diverse market for real estate development and that, absent some restraining factor such as the defendants' discriminatory and exclusionary practices, the housing market would have been much more economically and racially diverse. DuPage County is, after all, a large suburban county—primarily residential but increasingly characterized by manufacturing, retail trade and service uses as well as marked by the remnants of agriculture. Approximately 209 square miles of the County are unincorporated, and 40% of the County's total 338 square miles are subject to the County's developmental control. Between 1967 and 1972 over 50% of all new

---

**4.** An immaterial variance from these figures appears in the 1970 Census Report. According to that report, DuPage County had a total population of 491,882, of which 1,652 or 0.34% were black. Stipulation of Evidence, Vol. I at 259, ¶ 94, H(7).

**5.** Many of these same patterns continued in the decade of the 1970's. In 1980, DuPage had a population of 658,835, an increase of 35% over the 1970 figure, with the black population constituting 1.17% of the total population. DuPage had the highest median gross rent ($322), the highest per capita income and the highest median family income in Illinois. BUREAU OF THE CENSUS, U.S. DEPT. OF COMMERCE, COUNTY AND CITY DATA BOOK: 1983, 130–57.

housing units in the unincorporated areas were multi-family units.

The majority's conclusion that DuPage's racial and economic exclusiveness was merely the product of unbiased economic forces ignores the reality that, when the present case was filed in 1971, DuPage County already had a nearly completed large subsidized housing development, Mayslake Village, in an unincorporated area. These 433 subsidized units were for the elderly—thus not serving as a magnet for families with low income moving from other sections of the Chicago metropolitan area. Even more significantly perhaps, during the course of the district court proceedings in this suit and apparently as a result of pressure generated by it, the County approved rehabilitation of a number of existing housing units for low- and moderate-income individuals and construction of some federally subsidized units also in unincorporated areas. These units, however, are still primarily intended for the elderly. *HOPE*, slip op. at 69, 96; Stipulation of Evidence, Vol. VII at 2064–65, ¶ 1288. The very existence of such housing strongly suggests an economic demand for, and developers' willingness to provide, other subsidized developments had these not been so firmly squelched by such powerful restraining factors as the policies of the County Board.

In fact, the defendants indicated their lack of confidence in the impartial forces of "the market" to keep out low-cost housing by requiring developers to represent at zoning proceedings that they would build only expensive housing units. In 84% of all applications for a zoning variance or special use permit submitted between June 1973 and April 1976 involving ten or more units, the price of the units was stated. The district court found that

> the rental or sales prices were frequently discussed at Zoning Board hearings almost always in terms of the kinds of residents who could afford to pay them, whether they would be "high class," "compatible" with existing residents, "very desirable" people, "a very fine

group of people," "in a fairly good economic strata," etc. It is clear that applicants assured Zoning Board members in any way they could that tenants or owners in the units for which they were seeking a variation or special use permit would be well-to-do and similar or compatible with the existing residents who make DuPage County the fourth richest in the United States ans almost entirely white.

*HOPE*, slip op. at 80. Again suggesting that economic factors alone would not exclude low-cost housing, defendants' experts testified that, "[f]rom the vantage point of a builder-developer, new housing construction is essentially the same in DuPage County as elsewhere in Illinois and the United States." Stipulation of Evidence, Vol. VII at 2230, 2297, ¶¶ 1562, 1660.

The majority asserts that the economics of DuPage County prevent individuals of low or moderate income from living in the unincorporated areas because such services as public transportation, convenient shopping and school opportunities are not found in rural areas. Slip op., *supra*, at n. 4. Aside from its failure to substantiate this conclusion with facts, the majority's statement seems to ignore the logic that services required for rich and poor alike develop within a neighborhood or area after the need for such services arises. Schools, transportation and shopping centers do not exist in a population vacuum. If subsidized housing were permitted, appropriate services would follow soon thereafter.

The effective economic reality of the DuPage County housing market is not to be found in any additional expense attaching to low-cost housing *per se*. Rather, the burden on a prospective developer, who had first purchased a site, developed plans and sought a zoning variance, would result from the inevitable denial of the variance, the cost in time and money of contesting that denial in protracted court litigation and the developer's presumed loss of the good will of DuPage County authorities.

The majority opinion also relies heavily upon the Supreme Court's statement in

*Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), that the inability of those plaintiffs to find housing in Penfield, a suburb of Rochester, New York, was not the result of the defendants' conduct but rather was a "consequence of the economics of the area housing market." *Warth,* 422 U.S. at 506, 95 S.Ct. at 2209. Penfield and DuPage County are so different, however, as to make the application of the *Warth* statement to the DuPage facts wholly inappropriate. Penfield occupies only 36 square miles, and only 0.3% of the land available for residential construction was allocated to multi-family structures. In contrast, there are 209 square miles in unincorporated DuPage County and 50% of the new housing constructed there between 1967 and 1972 was multi-family units. Finally, there was subsidized housing for the elderly in DuPage County before 1971 and subsidized low- and moderate-income housing, primarily for the elderly, was built later during the pendency of this lawsuit. These projects were presumably acceptable to the defendants because they were not magnets for the non-white and for young families with children. But their very existence, which had no parallel in *Warth,* makes any application of *Warth's* economic rationale unjustifiable.

## II

In turning to examine specifically the application of the standing requirement to this case, I note most importantly that the organization, HOPE, stands on far firmer ground, with respect to the existence of a case or controversy, than did its counterpart in *Warth.* HOPE, Inc. is an Illinois not-for-profit corporation whose purposes are described in its Articles of Incorporation as:

> To promote social situations which foster the health and welfare of the poor and underprivileged and in furtherance of this purpose, the corporation shall have the power to acquire improved residential property in order to make the same available for use as dwelling places for those families or individuals unable to obtain

adequate housing due to financial hardship.

*HOPE,* slip op. at 36. As Judge Grant noted in the panel opinion in this case, HOPE's explicit corporate purpose is to promote and to find adequate housing for individuals with low and moderate incomes. 717 F.2d 1061, 1073–74 (7th Cir.1983). HOPE refers families to the relatively few federally subsidized units in DuPage County and, until 1975, it provided the only low rent housing available in DuPage. *HOPE,* slip op. at 37–38. HOPE thus has standing in its own right and can allege injury to itself because its very corporate purpose of finding housing for low- and moderate-income individuals is directly frustrated by the defendants' policies. As stipulated by the parties, "HOPE is successful in finding the needed housing in only a very small percentage of cases, for the housing simply does not exist in DuPage County." Stipulation of Evidence, Vol. IV at 1347, ¶ 821.

In *Warth,* on the other hand, the organizational plaintiff Metro-Act had, as its relatively diffuse purpose, "to alert ordinary citizens to problems of social concern; ... to inquire into the reasons for the critical housing shortage for low and moderate income persons in the Rochester area and to urge action on the part of citizens to alleviate the general housing shortage for low and moderate income persons." 422 U.S. at 494, 95 S.Ct. at 2203. Unlike HOPE's specific purpose and activity of seeking out low- and moderate-cost housing in DuPage County for its clients, Metro-Act had no such similarly focused purpose of its own—in Penfield or elsewhere for that matter—to support standing, nor did it undertake to find such housing for its clients. In fact, the Supreme Court never even discussed Metro-Act's claim to standing as an organization in its own right.

The Court did, however, in *Havens Realty, supra,* analyze an organization's standing to sue in its own right. In that case, the organization HOME alleged that the defendants' steering practices had frustrated its efforts to find housing and to refer those whom it counseled to equal access

housing. In concluding that HOME had alleged adequate injury in fact to establish standing, the Court stated:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests....

455 U.S. at 379, 102 S.Ct. at 1124. Further, the Court reiterated, citing *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), that the fact that HOME's alleged injury was to its noneconomic, but specific, interest in encouraging open housing did not affect the nature of the injury suffered or deprive the organization of standing. *Id.* at 379 n. 20, 102 S.Ct. at 1124 n. 20.

The weakness of the majority's position is revealed by its unconvincing attempt to distinguish *Havens Realty*. The majority undertakes this distinction only by pointing out that HOME had alleged specific instances of racial steering, while HOPE was unable to allege a denial of a specific zoning permit. The ability to allege or prove specific instances of discrimination, however, goes only to the plaintiffs' ability to establish the merits of their case and not to a determination whether they have standing to bring the action. Nor is denial of a zoning permit by any means the only possible evidence of discrimination.

In the case before us, HOPE has alleged and, to the satisfaction of the district court, proven that the defendants intentionally attempted to exclude low- and moderate-income persons from residing in DuPage County. *Planning for People Coalition v. DuPage County, Illinois*, 70 F.R.D. 38, 47 (N.D.Ill.1976). HOPE's reason for being is thus directly thwarted by the defendants'

illegal conduct. The district court detailed several instances of specific and particularized discriminatory activity which resulted in maintaining the DuPage County barriers against the poor and the non-white. The *Havens Realty* Court made it clear that even broad allegations of practices which impair an organization's "ability to provide counseling and referral services for low- and moderate-income homeseekers" are enough to confer standing upon the organization seeking relief. 455 U.S. at 379, 102 S.Ct. at 1124.

The majority opinion also conflicts with the recent Seventh Circuit precedent of *People Organized for Welfare and Employment Rights (P.O.W.E.R.) v. Thompson*, 727 F.2d 167 (7th Cir.1984), which applied *Havens Realty* to P.O.W.E.R., an organization whose purpose was to improve conditions of the poor and unemployed by attempting to facilitate voter registration activities, which were actually conducted by others. This court said that, if P.O.W.E.R. had itself been attempting to register new voters, then anyone who had prevented it from conducting such registration would have caused injury in fact to P.O.W.E.R. "The injury brought about by a violation of law must, to support a federal court action, ... affect one's possessions or bodily integrity or *freedom of action ....*" 727 F.2d at 171 (emphasis added). The very circumstances upon which this court relied in distinguishing *P.O.W.E.R.* from *Havens Realty* serve equally to distinguish HOPE both from P.O.W.E.R. and from Metro-Act in *Warth* and to establish the close parallel between HOPE and HOME in *Havens Realty*. HOPE itself actively seeks adequate housing for its low- and moderate-income clients, and HOPE's purposes have been frustrated by the defendants' actions. This circumstance demonstrates that it has suffered injury in fact and has standing to sue in its own right.

The fact is that HOPE is also much more analogous to the Metropolitan Housing Development Corporation, the developer-plaintiff which was granted standing to sue in *Village of Arlington Heights v. Metropoli-*

*tan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), than to Metro-Act in *Warth*. HOPE has, at times, renovated housing for low- and moderate-income individuals, but, even more importantly, it actively seeks housing for its clients. That is its very reason for being. It is an action agency confronting the very evil sought to be corrected by this lawsuit. The case for standing could hardly be clearer.

It is also clear that the individual plaintiffs, as well as HOPE in its representational capacity, have standing. HOPE's low- and moderate-income directors actually sought housing in DuPage County, while each of the ten individual plaintiffs here, prior to the time of filing this lawsuit, had contacted HOPE for assistance in finding adequate housing in DuPage County. Through HOPE, five of the individual plaintiffs have found acceptable housing, while the others were, as of the date of the district court opinion of October 1, 1981, still seeking adequate housing. All the plaintiffs, except one, are or were residents of DuPage County. Some of the plaintiffs lived in the Chicago metropolitan area outside of DuPage County but worked in DuPage and so sought housing which would be nearer their place of employment. The individual plaintiffs represent a cross-section of incomes which would qualify them for federal housing assistance. *HOPE*, slip op. at 2; Plaintiffs-appellees' brief at 4–5. The individual plaintiffs have thus demonstrated particularized needs for adequate housing which could have been satisfied if the defendants had not barred suitable housing from the County. Instead, DuPage County allowed some subsidized housing for elderly individuals but not for those with younger families.

In *Warth*, on the other hand, some of the individual plaintiffs were persons of low or moderate income living in the Rochester area; none of these had ever lived in Penfield. These plaintiffs alleged that the challenged Penfield zoning ordinance increased the cost of housing there and thus precluded them from living in Penfield as they wished. But the Supreme Court noted, in denying those plaintiffs standing, that they had failed to establish that they would be able to afford the type of housing which would be constructed even if the zoning ordinance were changed. 422 U.S. at 506 and n. 16, 95 S.Ct. at 1123 and n. 16. In the case before us, however, the plaintiffs explicitly alleged and the district court found that they would qualify for the low- and moderate-income federally subsidized housing which they seek.

Certain other plaintiffs in *Warth*, who were taxpayers of the City of Rochester, alleged only that their Rochester taxes had been increased because of Penfield's exclusionary practices—certainly a remote claim based on an conjectural chain of causation having no counterpart in the present case. In addition, Metro-Act had attempted to claim standing in its representational capacity because some of its members who lived in Penfield had been denied their associational right to live in an integrated community. The Supreme Court equated this claim with an attempt to raise putative rights of third parties and thus considered that the claim violated the prudential considerations implicated in a standing determination.

In rejecting the plaintiffs' claim to standing here, the majority relies heavily upon the alleged lack in the case before us of a specific project for low- or moderate-income residents in which the plaintiffs intended to live and which was thwarted by the defendants' policies. The lack of a specific project, however, merely bespeaks the force and persuasiveness of the County's discriminatory policy. As Judge Will found, the County's unbending determination to exclude the poor from within its borders was too well understood by developers to induce even the most quixotic to attempt a low-income project there. "If [a specific project were required to establish standing], the more effective the implementation of a discriminatory policy, the less opportunity there would be to challenge it." *HOPE*, slip op. at 95.

The majority here pays mere lip-service to the Supreme Court's directive in *Warth* that its holding there does not mean

that the plaintiff who challenges a zoning ordinance or zoning practices must have a present contractual interest in a particular project. A particularized personal interest may be shown in various ways, which we need not undertake to identify in the abstract.

422 U.S. at 508 n. 18, 95 S.Ct. at 1123 n. 18. Instead, the majority transforms the *Warth* holding into an absolute requirement that the focus of a suit must be on a particular project. The majority also relies on *Arlington Heights* to establish the point that a specific project is required as the basis for standing. One of the plaintiffs in *Arlington Heights*, the Metropolitan Housing Development Corporation ("MHDC"), had indeed developed a specific project and was granted standing. According to the majority, therefore, the fact that no developer or builder had apparently proposed such a project to the DuPage County Zoning Board should serve as a bar to this and any other such litigation.

The facts of *Arlington Heights*, the only apposite Supreme Court case in which a plaintiff-developer had developed a project, are, however, somewhat unusual and merit consideration. In that case members of a religious order, which owned 80 acres of land, decided to devote a portion of that land to low- and moderate-income housing. They sought out a nonprofit developer, MHDC, to develop plans for a suitable project, and they agreed to a 99-year lease with an accompanying sale agreement contingent upon MHDC's securing zoning clearance and federal housing assistance. The Supreme Court held that for two reasons MHDC had standing to sue the township after zoning clearance was denied. First, MHDC had a particularized pecuniary interest in the project because of the funds which it had expended in developing the plans and conducting the studies for its zoning petition (even though it had not been required to pay the purchase price because of the contingent nature of the sale). Second, the Supreme Court emphasized that MHDC's concern need not be based solely on its pecuniary interests.

It has long been clear that economic injury is not the only kind of injury that can support a plaintiff's standing. MHDC is a nonprofit corporation. Its interest in building Lincoln Green stems not from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce. This is not mere abstract concern about a problem of general interest.

429 U.S. at 262–63, 97 S.Ct. at 562 (citations omitted). MHDC's noneconomic concerns are quite similar to those of HOPE.

It is unrealistic to expect that a commercial developer would be willing to take the sorts of financial and other risks which MHDC took in order to establish integrated housing in Arlington Heights. Faced with what appears to be a strongly held and consistently adverse attitude, a developer will look elsewhere rather than accept the burdens not only of developing plans for a project which will probably never be approved but also of the inevitable and interminable lawsuit and of the intimidating loss of official goodwill. In *Arlington Heights*, not only was the developer a nonprofit corporation seeking the integration of housing, but the land owner had also disclaimed the usual commercial profit motive and had the explicit purpose of fostering low- and moderate-income housing. To require in other circumstances of exclusionary zoning practices that *commercial developers* step forward with a specific project as did MHDC in *Arlington Heights* is to close the door effectively on most future challenges. The economic reality of DuPage County is that commercial developers would have to accept the additional expense and risk of "buying" a lawsuit to establish their right to build low- and moderate-income housing in the County. In addition, they would presumably incur the not insignificant hostility of officialdom in DuPage. It is not to be expected that an altruistic developer will now step forward to undertake the thankless task of securing admission to DuPage County of the poor and the non-white, nor should we have to wait for one to do so.

Finally, and perhaps most tellingly, the district court in *Warth* had held that the plaintiffs lacked standing. Here, of course, the finder of fact arrived at the crucial conclusion that the plaintiffs in the instant case had suffered injury in fact and have met the prudential tests. Contrary to the majority's depiction, the district court in the present case did not find standing based exclusively on the plaintiffs' allegation of a conspiracy between the County and developers. Rather, the district court specifically found that the individual plaintiffs had established standing by alleging "facts indicating an intentional effort by the County to exclude low and moderate income persons from the County and thereby preclude blacks and other minorities from residing in DuPage County in any substantial numbers...." *Planning for People Coalition v. DuPage County, Illinois,* 70 F.R.D. 38, 47 (N.D.Ill.1976). This determination of fact by the district court should be evaluated under the "clearly erroneous" standard of review. However, the majority has applied no such standard but has mistakenly concluded that these plaintiffs lack the requisite standing, despite the principles laid down in *Warth, Arlington Heights* and *Havens Realty.*

It is particularly unfortunate that the plaintiffs here have been denied their day in court on the merits since exclusionary practices in housing affect in a sometimes fundamental way equal opportunities in other areas of life. The courts of the Northern District of Illinois and this court have in recent years addressed racial discrimination in, for example, education, voting and employment in the Chicago area. It is frequently difficult, however, to address these other sorts of discrimination effectively in situations where housing may be segregated by race. Without coming to grips with housing, it is difficult to come to grips with anything else.

For example, in *Rybicki v. State Board of Elections of Illinois,* 574 F.Supp. 1147 (N.D.Ill.1983), the three-judge court addressed charges of racial segregation and infringement of associational rights by the drawing of state legislative districts which allegedly followed racial housing boundaries on the south and west sides of Chicago. To the extent a problem may have existed, it was a function of the starkly segregated housing of blacks in the City of Chicago. The same observation could also obviously be made about school segregation. *See, e.g., Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (invalidating interdistrict remedy for school segregation which required bridging of boundary lines between city and suburban school districts); *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (respondent school board argued that racial or ethnic concentrations in the schools were result of residential patterns and not of purposeful segregative policies).

Exclusionary housing and zoning practices are surely not unique to DuPage County. But the federal courts must have the will and the determination to confront such practices wherever they arise. To erect an unnecessary and unjustifiable "standing" barrier here is to abdicate dangerously our responsibility to stand against racial and economic discrimination in all its forms.

I therefore respectfully dissent.